**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KASPERSKY LAB, INC.; and | ) | |
| | ) | |
| KASPERSKY LABS LIMITED | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:18-cv-00325-CKK |
| | ) | |
| v. | ) | |
| | ) | - Oral Argument Requested - |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

**INTRODUCTION**..................................................................................................... 1

**FACTUAL BACKGROUND**...................................................................................... 2

**LEGAL STANDARD FOR MOTION TO DISMISS** ............................................. 3

**ARGUMENT** .............................................................................................................. 4

    **I.**    **NDAA § 1634(a) and (b) Impose a Historical Category of Punishment.** ............... 8

        **A.**    **The NDAA Effects a Permanent Legislative Debarment that Qualifies as Punishment Under the Historic Test.** ..................................................... 9

        **B.**    **The Breadth and Reputational Harm of the Debarment Demonstrates its Punitive Character Under the Historic Test.** ................................................... 12

        **C.**    **The Government's Attempts to Re-Characterize the Debarment are Unavailing.** ........................................................................................... 14

            **1.**    **The NDAA is a Permanent Debarment, Not a "Line of Business" Restriction.** ............................................................................... 14

            **2.**    **The 'Past v. Future Conduct' Distinction has No Application Here** ........ 17

            **3.**    **There is No "Proceed with Dispatch" Exception to the Historical Test.** . 19

            **4.**    **The Historic Test Does Not Require Congress's Explicit Determination of Guilt.** ............................................................................................. 20

    **II.**    **The NDAA Ban Imposes "Punishment" Under the Functional Test.** ................... 21

        **A.**    **The NDAA is Functionally a Punishment, Notwithstanding the National Security Context.** ........................................................................................ 21

        **B.**    **Congress Failed to Tailor the Nexus Between Means of the NDAA and its End.** ............................................................................................... 23

        **C.**    **Congress has Imposed a Burden Clearly Disproportionate to the Purported Nonpunitive Purpose.** ................................................................................ 24

        **D.**    **Congress Failed to Provide Any Protective Measures for Kaspersky Lab.** .. 26

        **E.**    **The Selectivity and Scope of the Statute is Indicative of a Punitive Purpose.** 28

        **F.**    **Less Burdensome Alternatives also Demonstrate the NDAA's Punitive Function.** ........................................................................................ 29

**III.    The Absence of a Legislative Record Further Indicates a Congressional Intent to Punish.**................................................................................................................................. **29**

**CONCLUSION** ..................................................................................................................... **31**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abhe & Svoboda, Inc. v. Chao*,
  508 F.3d 1052 (D.C. Cir. 2007) ................................................................4

*ACORN v. United States*,
  618 F.3d 125 (2d Cir. 2010) .................................................................26

*Am. Communications Assn, C.I.O. v. Douds*,
  339 U.S. 382 (1950) ....................................................................17, 18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................3

*BellSouth Corp. v. FCC*,
  162 F.3d 678 (D.C. Cir. 1998) ...................................................... *passim*

*BellSouth v. FCC*,
  144 F.3d 58 (D.C. Cir. 1998) ........................................................ *passim*

*Bryson v. United States*,
  396 U.S. 64 (1969) .......................................................................18

*Caudell v. City of Toccoa*,
  153 F. Supp. 2d 1371 (N.D. Ga. 2001) ...........................................10, 28

*Clark v. Dist. of Columbia*,
  241 F. Supp. 3d 24 (2017) .................................................................4

*\*Consol. Edison Co. of N.Y., Inc. v. Pataki*,
  292 F.3d 338 (2d Cir. 2001) ........................................................ *passim*

*Crain v. Mountain Home*,
  611 F.2d 726 (8th Cir. 1979) ........................................................10, 19

*Cummings v. Missouri*,
  71 U.S. 277 (1866) ...................................................................9, 12, 20

*Dehainaut v. Pena*,
  32 F.3d 1066 (7th Cir. 1994) .............................................................23

*Elgin v. United States*,
  697 F. Supp. 2d 187 (D. Mass. 2010) ...................................................27

*Fla. Youth Conservation Corps., Inc. v. Stutler*,
  2006 U.S. Dist. LEXIS 44732 (N.D. Fl. June 30, 2006) ...............................................6, 10, 21

*Foretich v. United States*,
  351 F.3d 1198 (D.C. Cir. 2003) .................................................................................. *passim*

*Fresno Rifle & Pistol Club, Inc. v. Van De Kamp*,
  965 F.2d 723 (9th Cir. 1992) ...............................................................................................15

*Ex Parte Garland*,
  71 U.S. 333 (1867)........................................................................................9, 12, 17, 18

*Linnas v. INS*,
  790 F. 2d 1024 (2d Cir. 1986).............................................................................................22

*Little v. City of N. Miami*,
  805 F.2d 962 (11th Cir. 1986) ............................................................................................13

*Martin v. Houston*,
  176 F. Supp. 3d 1286 (N.D. Ala. 2016)............................................................................4, 8

*Mendelsohn v. Meese*,
  695 F. Supp. 1474 (S.D.N.Y. 1988)................................................................................5, 12

*Nixon v. Adm'r of Gen. Servs*,
  433 U.S. 425 (1977)................................................................................................. *passim*

*Planned Parenthood of Cent. N.C. v. Cansler*,
  877 F. Supp. 2d 310 (M.D.N.C. 2012) ...........................................................................6, 12

*SBC Communs., Inc. v. FCC*,
  154 F.3d 226 (5th Cir. 1998) ....................................................................................6, 15, 16

*Seariver Maritime Fin. Holdings, Inc. v. Mineta*,
  309 F.3d 662 (9th Cir. 2002) ........................................................................................6, 20

*Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*,
  468 U.S. 841 (1984)...............................................................................................................7

*United States v. Brown*,
  381 U.S. 437 (1965).................................................................................................. *passim*

*United States v. Lovett*,
  328 U.S. 303 (1946).................................................................................................. *passim*

**Statutes**

Anti-Terrorism Act of 1987 ........................................................................................................12

National Defense Authorization Act for Fiscal Year 2018, Pub. Law No. 115-91 ........................*1*

Telecommunications Act of 1996 ................................................................................................15

**Other Authorities**

Binding Operational Directive 17-01 (Sept. 19, 2017) ................................................................14

New York Times, Opinion, The Russian Company that is a Danger to Our
Security, Sept. 4, 2017 (Complaint, Ex. C) ...............................................................14, 23, 25

Press Release, *Shaheen's Legislation to Ban Kaspersky Software Government-
Wide Passes Senate As Part of Annual Defense Bill,* Sep. 18, 2017, *available
at:* https://www.shaheen.senate.gov/news/press/shaheens-legislation-to-ban-
kaspersky-software-government-wide-passes-senate-as-part-of-annual-
defense-bill- (Complaint, Ex. E) ...........................................................................................30

Press Release, *Shaheen's Government-Wide Kaspersky Ban Signed Into Law*,
Dec. 12, 2017, *available at*
https://www.shaheen.senate.gov/news/press/shaheens-government-wide-
kaspersky-ban-signed-into-law .............................................................................................13

Laurence H. Tribe, American Constitutional Law (2d ed. 1988) ......................................19, 20, 22

Bill of Attainder Clause, U.S. Constitution, Art. I, § 9 and §10 ..........................................*passim*

**INTRODUCTION**

Throughout our history, impelled by political pressure and expediency, the U.S. Congress and State Legislatures have, from time to time, acted beyond their Constitutional mandate by enacting laws that inflict individual punishment.  Such actions are as predictable in a democratic form of government as they are timeless and that is why the founders saw fit to prohibit bills of attainder by Art. I, § 9 and §10 of the Constitution.  Sections 1634(a) and (b) of the National Defense Authorization Act for Fiscal Year 2018, Pub. Law No. 115-91 (the "NDAA") violate the Bill of Attainder Clause because they single out by name Kaspersky Lab—one of the world's leading antivirus software companies—for permanent, unconditional, and inescapable debarment from all federal government contracting.  These provisions forever bar Kaspersky Lab— regardless of any future changes to its service offerings, structure, ownership or otherwise—from directly or indirectly, in whole or in part, providing "*any* hardware, software, or services" to the federal government.  Although introduced as a means to counter a supposed threat posed by Kaspersky Lab's antivirus software to federal government information systems, Sections 1634(a) and (b) as enacted are so overbroad they prohibit the company from providing "*any…*services," be they technology-related or not.

Rather than enacting a law of general applicability, Congress exercised the powers delegated to the other branches of the government and determined without any semblance of due process that Kaspersky Lab is a bad actor and deserving of severe punishment, specifically, permanent debarment.  These problematic legislative actions are exactly what the founders warned about and sought to protect against.

In its motion to dismiss, the government concedes that the NDAA satisfies the specificity element of the bill of attainder test—so the only question is whether the law imposes

punishment.  The government principally attempts to re-characterize the debarment as mere "line of business" restrictions upheld in a series of telecommunication breakup cases.  And, in a further attempt to dispel the punitive function of the NDAA, the government minimizes the permanent, inescapable, and unconditional nature of the debarment, and disregards entirely the profound reputation and financial damage it causes the Company.

Courts at every level have not hesitated to invalidate laws targeting named individuals and corporations for punishment, just as the NDAA does by singling out Kaspersky Lab for legislative debarment.  Accordingly, for all the reasons set forth below, we ask the Court to deny the Motion to Dismiss with a finding that Sections 1634(a) and (b) of the NDAA targeting Kaspersky Lab are an unconstitutional bill of attainder.

## FACTUAL BACKGROUND

As set out in detail in the Complaint, the broader NDAA authorizes appropriations and sets forth policies for the U.S. Department of Defense programs and activities.  *See* Compl. ¶ 24.  Prior to its passage, it was amended to include Sections 1634(a) and (b), which state that effective October 1, 2018, "[n]o department, agency, organization, or other element of the Federal Government may use … any hardware, software, or services developed or provided, in whole or in part, by … Kaspersky Lab…"  Pub. Law No. 115-91, § 1634(a) and (b).  *See* Compl. ¶¶ 25-37.  Congress adopted the language debarring Kaspersky Lab in the context of mounting animosity towards Russian and substantial political pressure on all branches of government in reaction to the apparent Russian interference in the 2016 Presidential Election (and a wide range of other unrelated foreign policy and national security concerns involving Russia).  *See* Compl. ¶

3.[1]

The government emphasizes that various congressional committees considered issues related to the risk of cyber-security breaches of US government information systems. *See* Memorandum in Support of Defendant's Motion to Dismiss ("Br.") at 3-7. However, those committees did not deliberate any legislative proposal as broad as that which was ultimately enacted in the NDAA to address any perceived risk, much less the limits the constitution places on Congress's authority to single out Kaspersky Lab. *See* Compl. ¶¶ 26-37, 41-42. Therefore, any other references to Kaspersky Lab in other legislative processes are not instructive on the question of whether Congress specifically tailored Section 1634 to effectively address these policy concerns, nor do they otherwise provide insight into the purpose of Section 1634 or how Section 1634 seeks to achieve that purpose.

In sum, apart from extra-legislative media statements by Senator Shaheen and the Conference Reports quoted in the Complaint and its Exhibits, the legislative record of Section 1634 itself is silent, and there is no meaningful fact-finding, analysis, or floor debate. *See* Compl. ¶¶ 24-37, 41-42.

### LEGAL STANDARD FOR MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(6) must be denied when a complaint contains sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "In evaluating a Rule 12(b)(6) motion…a court must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations."

---

[1] As explained in the Complaint, Kaspersky Lab is a multinational company, comprised of Plaintiffs Kaspersky Lab, Inc., a Massachusetts corporation, and its U.K. parent company Kaspersky Labs Limited, with global headquarters in Moscow, Russia. *See Id*. at ¶¶1, 12-13, 18-20.

*Clark v. Dist. of Columbia*, 241 F. Supp. 3d 24, 29 (2017)(J. Kollar-Kotelly)(citation omitted).

*See, e.g., Martin v. Houston*, 176 F. Supp. 3d 1286, 1303 (N.D. Ala. 2016)(sustaining bill of attainder claim on Rule 12(b)(6) motion because of sufficient factual allegations).

Further, "[when] deciding a Rule 12(b)(6) motion, a court may consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Clark*, 241 F. Supp. 3d at 29 (internal quotations omitted).   The court may also consider documents in the public record of which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

## ARGUMENT

The Bill of Attainder Clause is a safeguard against "trial by legislature" designed not only to maintain the separation of powers but also to prevent punishment without procedural protections:

> [T]he Bill of Attainder Clause not only was intended as one implementation of the general principle of fractionalized power [(*i.e.*, among the three branches)], but also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.
> * * * *
> By banning bills of attainder, the Framers of the Constitution sought to guard against such dangers by limiting legislatures to the task of rule-making. It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments.

*United States v. Brown*, 381 U.S. 437, 442, 445-46 (1965).   Thus, in concluding that the Bill of Attainder Clause prohibits laws singling out individuals as "a threat to the national security," the Supreme Court has explained: "Congress must accomplish such results by rules of general

applicability. It cannot specify the people upon whom the sanction it prescribes is to be levied. Under our Constitution, Congress possesses full legislative authority, but the task of adjudication must be left to other tribunals." *Id.* at 461.

"Today, the prohibition against bills of attainder prevents any 'legislative acts, *no matter what their form*, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial.'" *BellSouth Corp. v. FCC*, 162 F.3d 678, 683 (D.C. Cir. 1998), *quoting United States v. Lovett*, 328 U.S. 303, 315 (1946)(emphasis added).

The scope of the clause is not "narrow" as the government claims. *See* Br. at 9. In fact, the Supreme Court has stated, "[T]he writings of the architects of our constitutional system[] indicate[] that the Bill of Attainder Clause was intended *not* as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function...." *Brown*, 381 U.S. at 442 (emphasis added), *also Id.* at 447. *See also, Mendelsohn v. Meese*, 695 F. Supp. 1474, 1488, n.24 (S.D.N.Y. 1988)("The language prohibiting bills of attainder is sweeping, and the Supreme Court's interpretations of it have been expansive.").

The Bill of Attainder Clause protects corporations (like Plaintiffs) as well as individuals. *See BellSouth Corp. v. FCC,* 162 F.3d 678, 684 (D.C. Cir. 1998)(hereinafter, "*Bell South II*")(assuming that "'the Bill of Attainder Clause protects corporations as well as individuals'")(*quoting BellSouth v. FCC*, 144 F.3d 58, 63 (D.C. Cir. 1998), *cert. denied*, 526 U.S. 1086 (1999)(hereinafter, "*BellSouth I*")); *Consol. Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 349 (2d Cir. 2001), *cert denied*, 537 U.S. 1045 (2002)("We therefore hold that corporations *must* be considered 'individuals' that may not be singled out for punishment under

the Bill of Attainder Clause")(emphasis added, quotation omitted); *Seariver Maritime Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 668 n.3 (9th Cir. 2002)("We assume, without deciding, that the Bill of Attainder Clause applies to corporations"); *SBC Communs., Inc. v. FCC*, 154 F.3d 226, 234 n.11 (5th Cir. 1998)(explaining that it "does seem likely" that "the Bill of Attainder Clause applies to corporations"). *See also, generally*, *Fla. Youth Conservation Corps., Inc. v. Stutler*, 2006 U.S. Dist. LEXIS 44732, *2-4 (N.D. Fl. June 30, 2006); *Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 314-15, 321-25 (M.D.N.C. 2012). As Defendant notes, the D.C. Circuit has added that "there are differences between a corporation and an individual under law," and that "any analogy [between cases involving an individual and a corporation] must necessarily take into account this difference." *BellSouth II*, 162 F.3d at 684.

"Under the now prevailing case law, a law is prohibited under the bill of attainder clause if it (1) applies with specificity, and (2) imposes punishment." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003). Here, the government does not dispute the specificity element.[2] *See* Br. at 11. Accordingly, the sole issue is punishment.

In its brief, the government omits an important part of the second factor of the punishment test which merits correction here. Specifically, the government states:

> To determine whether a statute constitutes legislative punishment, a court considers whether a statute (1) "falls within the historical meaning of legislative punishment;" (2) whether it "further[s] nonpunitive legislative purposes;" and (3) whether the legislative record "evinces a congressional intent to punish." *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 852 (1984)(citation omitted).

---

[2] "The element of specificity may be satisfied if the statute singles out a person or class by name or applies to "easily ascertainable members of a group." *Foretich*, 351 F.3d at 1217. Here, NDAA § 1634(a) and (b) could not be more specific. Section 1634 is entitled "PROHIBITION ON USE OF PRODUCTS AND SERVICES DEVELOPED OR PROVIDED BY KASPERSKY LAB." Section 1634(a) exclusively identifies and targets "(1) Kaspersky Lab (or any successor entity); (2) any entity that controls, is controlled by, or is under common control with Kaspersky Lab; or (3) any entity of which Kaspersky Lab has majority ownership."

Br. 10.  Importantly, however, the second factor includes the following language which is critical for the functional test as applied here: "whether the statute, '*viewed in terms of the type and severity of burdens imposed*, reasonably can be said to further nonpunitive legislative purposes.'" *Selective Serv. Sys.*, 468 U.S. at 852 (emphasis added, quoting *Nixon v. Adm'r of Gen. Servs,* 433 U.S. 425, 475-76 (1977)).

The government also contends, in connection with the punishment test, that "'only the clearest proof could suffice to establish the unconstitutionality of a statute' on the basis of impermissible congressional motive alone." Br. at 10, *quoting Flemming v. Nestor*, 363 U.S. 603, 617 (1960).  But the "clearest proof" requirement applies solely to the third factor above, and only when applicants seek to set aside a statute solely on the basis of that factor—not to any of the others. *See Foretich*, 351 F.3d at 1225 (explaining, under "motivational test," that "this prong by itself is not determinative in the absence of unmistakable evidence of evidence of punitive intent.…")(quotation omitted).

Finally, "[t]he Court has applied each of these criteria as an independent—though not necessarily decisive—indicator of punitiveness." *Id*. (citations omitted).  "[A] statute need not fit all three factors to be considered a bill of attainder; rather, those factors are the evidence that is weighed together in resolving a bill of attainder claim." *Id*. at 1218, *quoting Consol. Edison*, 292 F.3d at 350.  "[H]owever, the second factor—the so-called 'functional test'—invariably appears to be the most important of the three. Indeed, compelling proof on this score may be determinative." *Id*. (quotation omitted).  In addition, as set out below, certain enactments can be *per se* punitive if they fit the historical test.  Here, each of the three factors demonstrate the NDAA's imposition of punishment on Plaintiffs.

### I.      NDAA § 1634(a) and (b) Impose a Historical Category of Punishment.

The punishment analysis "begin[s] by examining whether the [challenged statute] imposes a burden that falls within the historical meaning of legislative punishment." *Foretich*, 351 F.3d at 1218.  If so, it is a bill of attainder.  *See, e.g.*, *Consol. Edison*, 292 F.3d at 351 ("Some types of legislatively imposed harm, in other words, are considered to be punitive per se.").[3]  The permanent debarment of Kaspersky Lab falls within the scope of the historic work and employment bans:

> The historical experience with bills of attainder in England and the United States offers a ready checklist of deprivations and disabilities so disproportionately severe and so inappropriate to nonpunitive ends that they *unquestionably* have been held to fall within the proscription of Art. I, § 9.  This checklist includes sentences of death, bills of pains and penalties, and *legislative bars to participation in specified employments or professions*.

*Foretich*, 351 F.3d at 1218 (quotation and citation omitted, emphasis added).

The D.C. Circuit does not treat the historical test as strictly binary—that is, as in *Foretich*, even where the burden does not necessarily fit precisely within the historic category, the congruity to historic punishments still carries weight within the three factors, and is important to the overall analysis. *See Id.* at 1218-20.  The government fails to consider this, much as it omits the D.C. Circuit's historic test which weighs the breadth and stigma of the burden. *See Id.* at 1219-20; Br. at 11-15.  The government instead attempts to trivialize the debarment as a mere regulatory "line of business" restriction.  *Id.* at 13-14.

---

[3] *See also, e.g., Bell South II*, ("[F]or example…a statute that names an individual and sentences him to death is a bill of attainder, *without regard* to whether Congress could articulate some nonpunitive purpose for the execution, such as the protection of public safety.")(*citing Brown*, 381 U.S. at 440, emphasis added). *See also, e.g., Martin v. Houston*, 176 F. Supp. 3d 1286, 1302 (M.D. Ala. 2016)("Where a claimant challenges some form of punishment that has not yet been recognized as falling within the scope of the bill of attainder clause, courts should [then] apply a functional approach to determine whether the penalty is constitutionally actionable.")(*citing Nixon,* 433 U.S. at 475).

### A.  The NDAA Effects a Permanent Legislative Debarment that Qualifies as Punishment Under the Historic Test.

The NDAA effects a permanent debarment that the bill of attainder clause was intended to prevent.  "The Court's four major decisions invalidating statutes on Bill of Attainder Clause grounds have *all involved legislations preventing specific classes of persons from pursuing certain occupations*."[4]  *BellSouth I*, 144 F.3d at 64 (emphasis added).  As the Supreme Court put it in *Lovett*, the statute at issue there, "[j]ust as the statute in [*Cummings v. Missouri*, 71 U.S. 277 (1866) and *Ex Parte Garland*, 71 U.S. 333 (1867)], operates as a legislative decree of perpetual exclusion from a chosen vocation," and is therefore unconstitutional. 328 U.S. at 316 (quotation omitted).  The Supreme Court more recently stated that "legislative enactment[s] barring designated individuals or groups from participation in specified employments or vocations" are "impermissible" and "unquestionably have been held to fall within the proscription of Art. I, § 9."  *Nixon,* 433 U.S. at 474.  "A statutory enactment that imposes [an employment bar] on named or identifiable individuals would be *immediately constitutionally suspect*." *Id*. at 473, 474-75 (emphasis added).  "'Disqualification from the pursuits of a lawful avocation, or from positions of trust…may also, and often has been, imposed as punishment.'" *Brown*, 381 U.S. at 448

---

[4]  "Those four [employment] cases came in two pairs":

> The first pair involved restrictions imposed immediately after the Civil War on those who had sided with the South, *see Cummings* (striking down amendments to Missouri constitution denying right to vote, hold office, teach, or serve as trustee for religious organization to persons who aided or sympathized with the Confederacy), and *Garland* (striking down federal law requiring attorneys to swear oath that they had never assisted Confederacy as condition of admission to practice in federal courts).  The second pair involved restrictions on Communist Party members during the Cold War, see *Lovett* (invalidating law cutting off payment of salaries to three named federal employees who were Party members), and *Brown* (invalidating law making it a crime for members of Party to serve as officers or employees of labor unions).

*BellSouth I*, 144 F.3d at 64.

(*quoting Cummings*, 71 U.S. at 320).   The Court has stated (and as the government acknowledges at Br. 12):  "This permanent proscription from any opportunity to serve the Government is punishment, and *of a most severe type*. It is a type of punishment which Congress has only invoked for special types of odious and dangerous crimes...." *Lovett,* 328 U.S. at 316 (emphasis added, citations omitted).

Of particular relevance here, in *Florida Youth Conservation Corps., Inc. v. Stutler,* 2006 U.S. Dist. LEXIS 44732, *1-6 (N.D. Fl. June 30, 2006), a federal district court followed these precedents and held, focusing on historic punishment, that a legislative debarment of a contractor violated the Bill of Attainder Clause.  Specifically, the court invalidated a Florida state law which singled out by name and debarred a corporation, which was the subject of unfavorable newspaper articles critical of its performance of state highway contracts.  *Id.* at *2-3.  There, the court expressly reasoned: "Prohibited punishments include barring designated individuals or groups from participation in specified employments or vocations....*This is legislative action very much akin to the enactments that prompted the framers to include in the Constitution a prohibition on bills of attainder.*" *Id.* at * 5 (quotation omitted, emphasis added).[5]

The NDAA squarely fits within this historic category.  Kaspersky Lab has been permanently, inescapably, and unconditionally "[d]isqualifi[ed] from the pursuits of a lawful avocation"—direct and indirect federal government contracting.  *See Brown*, 381 U.S. at 43.

---

[5] *See also, generally*, *Crain v. Mountain Home*, 611 F.2d 726, 728-29 (8th Cir. 1979)(explaining that "[t]he imposition on an easily identifiable individual or class of a sanction of mandatory forfeiture of [government] job or office has long been considered punishment under the bill of attainder clause," and holding that city council ordinance removing the City Attorney "falls squarely within [the historical] definitions of a bill of attainder."); *Caudell v. City of Toccoa,* 153 F. Supp. 2d 1371, 1379 (N.D. Ga. 2001)(explaining that "[i]n the instant case, it is important to note that the 'mandatory forfeiture of a job or office' has historically been regarded as punishment within the meaning of the Bill of Attainder Clause," and striking down state law that prohibited the same person from holding two specified government offices simultaneously, where the law applied to a sole individual) *quoting Nixon*, 433 U.S. at 469.

The NDAA thus "operates as a legislative decree of perpetual exclusion from a chosen vocation." *See Lovett,* 328 U.S. at 316, quotation omitted.  The NDAA indisputably operates as a "permanent proscription from any opportunity to serve the [g]overnment." *See Id*. at 316.  In fact, whereas the statute in *Lovett* cut off payment of compensation to the plaintiffs—it did not expressly terminate them, *Id*. at 305, 313-14, *cf,* Br.12—the NDAA goes further, expressly debarring Kaspersky Lab.

The NDAA's specific and unqualified ban on "*any*...[Kaspersky Lab] services" is all encompassing and permanent.  NDAA § 1634(a)(emphasis added).  Indeed, the ban on "*any*... [Kaspersky Lab] services" prevents the Company from offering *any* federal government services at any point in the future.   *See Id*. (emphasis added).   By its express terms, the statute permanently bars Kaspersky Lab from providing even non-technology related services to the government, whether now existing or developed in the future, *in any conceivable line of business into which the Company may seek to grow or enter in the future*.  In short, if the NDAA is left intact, Kaspersky Lab and its successors[6] may never again sell any "hardware" or "software" to any element of the federal government.  *See Id*.  Nor may it do so indirectly; the NDAA also prohibits the use of third-party products that utilize Kaspersky Lab "hardware" or "software." *See Id.*

The historic employment/work ban category is so important that courts have struck down statutes where the statutory language does not expressly speak in terms of vocation or work.  For

---

[6]  The extension of the debarment to any "successor entity" also constitutes a historical punishment.  *See Consol. Edison*, 292 F.3d at 351  (2nd Cir. 2001)( Some types of legislatively imposed harm, in other words, are considered to be punitive per se. The classic example is death, but others include....the punitive confiscation of property."). The "successor entity" language causes the debarment to stick to a Kaspersky Lab entity, even if sold to a new owner. This diminishes the value of the corporation, and constitutes a "punitive confiscation of property." *See Id.*

example, in *Planned Parenthood of Central North Carolina v Cansler*, 877 F. Supp. 2d 310, 324 (M.D.N.C. 2012), the court concluded that a statute "is punitive in nature based on a traditional understanding of punishment" where it singled out Planned Parenthood by name for a funding ban, excluding it "from any opportunity to apply for and/or receive [North Carolina Department of Health and Human Services]-administered contracts for non-abortion-related services, which [it] had effectively provided to the public in the past." The Court found "that such a categorical exclusion is analogous to legislation that prohibits a person or entity from engaging in certain employment, which courts have historically found to be associated with punishment." *Id*. (*citing Nixon*, 433 U.S. at 474-75, and *Fla. Youth Conservation*, 2006 LEXIS 44732 at *5).

Relatedly, in *Mendelsohn v. Meese,* 695 F. Supp. 1474, 1476, 1487-89 (S.D.N.Y. 1988), the court found that the challenged statute, the Anti-Terrorism Act of 1987, fell within the historic work-ban category, in that it designated the Palestine Liberation Organization a "terrorist organization and a threat to the interests of the United States," which specifically prohibited it from "maintaining an office, headquarters, premises, or other facilities within the jurisdiction of the United States" (but upheld the statute on other grounds). The court found that the law "inflicted punishment on those few individuals in this country [the U.S.] officially affiliated with the PLO, here by invitation of the United Nations"—such that "*[t]hese individuals suffer the kind of deprivation of livelihood which implicates the Bill of Attainder clause*." *Id*. at 1489 (emphasis added, *citing Lovett*, *supra*; *Garland*, *supra*; *Cummings*, *supra*.).

### B. The Breadth and Reputational Harm of the Debarment Demonstrates its Punitive Character Under the Historic Test.

The D.C. Circuit has instructed that in examining the historic test, courts consider (1) whether there is a "coherent and reasonable nexus between the burden imposed and the benefit to be gained," and (2) whether the "legislative enactment[]…set[s] a note of infamy on the persons

to whom the statute applies." *Foretich,* 351 F.3d at 1219, 1220 (applying historic test to a federal law which had deprived plaintiff visitation rights with his daughter, but had ceased to have legal effect since the daughter had became an adult).  Defendant does not consider either of these factors (*see* Br. at 11-15); however, both weigh heavily in Plaintiffs' favor on the historic test.

First, the NDAA lacks a "coherent and reasonable nexus" between the permanent, inescapable, unconditional debarment of Kaspersky Lab, and "the benefit to be gained"—*i.e.*, the removal of a supposed "threat" from federal information systems.  *See Id.*  Even taking into consideration and assuming the legitimacy of the threat as articulated by the government, the NDAA's singling out Kaspersky Lab for exclusion from all federal government contracting is disproportionate to that alleged threat—particularly with respect to the ban on "any…services." NDAA § 1634(a).  *See generally, Consol. Ed.,* 292 F.3d at 355 ("When faced with a bill that is so exceptionally narrow in scope, manifestly retrospective in focus, and unavoidably punitive in operation, we cannot allow it to stand....").

Second, the NDAA marks Kaspersky Lab with a "brand of infamy or disloyalty."  *See Foretich*, 351 F.3d at 1219.  With respect to the historic test, "a statute will be *particularly susceptible to invalidation* as a bill of attainder where its effect is to mark specified persons with a brand of infamy or disloyalty." *Id.* (emphasis added).[7]  The Court need look no further than statements on the day of the NDAA's enactment by Section 1634's chief author, who declared that Kaspersky Lab is "grave risk…to our national security."[8]  Senator Shaheen further stated

---

[7] *See also Little v. City of N. Miami*, 805 F.2d 962, 966 (11th Cir. 1986)(observing that a public censure is "a recognized mode of punishment in certain circumstances.")(quotation omitted).

[8] *See* Press Release, Jeanne Shaheen, U.S. Senator for New Hampshire*, Shaheen's Government-Wide Kaspersky Ban Signed Into Law (Dec. 12, 2017), *available at* https://www.shaheen.senate.gov/news/press/shaheens-government-wide-kaspersky-ban-signed-into-law.

that Kaspersky Lab constituted a "threat" posed by the Kremlin, which "federal agencies, local and state governments and millions of Americans unwittingly [were] inviting into their cyber networks and secure spaces."  Compl., Ex. C at 1.

### C.  The Government's Attempts to Re-Characterize the Debarment are Unavailing.

In opposing the historic test, the government argues that (1) the debarment is merely a "line of business" restriction; (2) a "past/future conduct" distinction informs the NDAA's non-punitive character; (3) there is an exception to the historic punishment category in instances in which Congress must "proceed with dispatch"; and (4) the debarment lacks the requisite "initial determination by the legislature of guilt." *See* Br. at 11-15.  None of these arguments have merit.

### 1.  The NDAA is a Permanent Debarment, Not a "Line of Business" Restriction.

The government has attempted to re-characterize the permanent, inescapable, unconditionally broad debarment of Kaspersky Lab as something far more innocuous—specifically a "line of business" restriction. *See* Br. at 12, 13.  As the government puts it, "[i]n Section 1634, Congress has simply determined that the government will no longer use the company's products or services."  *Id*. at 12.

As a threshold matter, this attempt to re-characterize the debarment is belied by the government's own statement in its briefing in *Kaspersky Lab, et al., v DHS, et al.*, 17-cv-2697-CKK.  There, in the course of its attempt to defeat standing, the government claims that the NDAA is "functionally identical" to Binding Operational Directive 17-01 (BOD). *See Id.* (Doc. 20, p. 22). Yet in issuing the BOD, the government dedicated an entire section in its Information Memorandum entitled, "**<u>Debarment</u>**," which explains that the government opted in favor of the

BOD rather than Federal Acquisition Regulation (FAR) because the BOD imposes more draconian restrictions than those available in the FAR.  *See Id*. at AR0005-0006.

Moreover, in its briefing in this case, the government never considers why the "line of business" characterization would apply to the NDAA.  *See* Br. at 11-13.  "Line of business" restrictions have been considered in only three bill of attainder cases—*BellSouth I, BellSouth II,* and *SBC*—each involving the competitive restructuring of the telecommunications market following the breakup of AT&T.[9]  Each of these cases presented challenges to the so-called "Special Provisions" of the Telecommunications Act of 1996—more specifically, in *BellSouth I,* the imposition of a temporary "structural separation" between dominant Bell Operating Companies (BOCs) and the electronic publishing market (§ 274), *see* 144 F.3d at 60, 61, 65-66; in *BellSouth II*, the requirement that the BOCs obtain prior authorization before providing long-distance services (§ 271), *see* 162 F.3d 679-80, 681-82; and in *SBC*, a challenge to all of the Special Provisions (*i.e.*, same plus similar provisions in §§ 273 and 275), *see* 154 F.3d at 229, 232.  "Perhaps most fundamentally…the Special Provisions…were part of a larger [legislative] *quid pro quo*"—and in fact the Telecommunications Act of 1996 as a whole actually *benefited* the BOCs by relieving them from burdens under the prior regime. *See Id.* at 244 (emphasis added); *see also*, *BellSouth I*, 144 F.3d at 66; *BellSouth II*, 162 F.3d at 690-91.  Importantly, the Special Provisions were temporary (they had an express expiration date) or were escapable, by use of corporate affiliates, or otherwise.  *See BellSouth I*, 144 F.3d at 61, 64-65, 66; *BellSouth II*, 162 F.3d at 683, 685; *SBC*, 154 F.3d at 242-43.  Accordingly, the courts reasoned that the "line

---

[9] The government seems to suggest, at Br. 13, that *Fresno Rifle & Pistol Club, Inc. v. Van De Kamp,* 965 F.2d 723 (9th Cir. 1992) is a "line of business" case.  It is not.  *See Id.* at 728 ("The Legislature has not…specified punishment based only on proof of the [gun] manufacturers' identity. Instead, it has precluded persons [(*i.e.*, anyone)] from manufacturing, distributing, selling, or possessing particular firearms which [the Legislature] has found are particularly dangerous.").

of business" restrictions did not constitute a historic "employment bar." *See BellSouth I*, 144

F.3d at 64-66; *BellSouth II*, 162 F.3d at 685-86; *SBC*, 154 F.3d at 242-44. In fact, the Fifth

Circuit indicated that another set of facts—akin to those considered here—*would* qualify as

historic punishment:

> There are employment bars and there are employment bars—some of the same
> character, others of a different character. *A non-perpetual legislative bar*,
> which forbids only a corporation's participating in a particular segment of the general
> business in which the corporation is engaged is not punishment when that bar is
> enacted for nonpunitive appropriate legislative purposes *under conditions to which
> that business effectively has agreed.*… [Even the dissent] acknowledg[es] that there
> is no real "victim" of Congress in this case.

*Id.* at 247 n.30 (emphasis added). *See also*, *BellSouth I*, 144 F.3d at 65 ("Placing § 274 among

the burdens historically forbidden as attainders seems especially dubious because it does not <u>bar</u>

the BOCs from electronic publishing but simply requires structural separation.")(emphasis

added).[10] The government overlooks this entirely. *See* Br. at 11-15.

Finally, the D.C. Circuit has reflected a consistent definitional distinction between

relatively innocuous "line-of-business" restrictions, on the one hand, and debarments on the

other. *See BellSouth I,* 144 F.3d at 65 (§ 274 is "*nothing more than* a line-of-business restriction,

comparable for example to the Glass-Steagall Act's limitation on the entry of commercial banks

into investment banking, or to the cross-ownership restrictions on broadcasters...");  *BellSouth II,*

162 F.3d at 686 (§271 amounts to "*run-of-the-mill* business regulations"—and therefore is

"difficult…[to] equate[] with the employment bar cases.")(emphasis added). The NDAA's

---

[10] Defendant says that in *BellSouth I*, the D.C. Circuit "refus[ed] to equate statute imposing
*restrictions* 'on corporations seeking to engage in specific types of commercial activity' with
'traditional employment debarments.'" Br. at 11 (quoting *BellSouth I*, 144 F.3d at 64-65,
emphasis added). The court there actually stated: "Although a statute imposing *structural
separations* on corporations seeking to engage in specific types of commercial activity *may be
analogous to such traditional employment debarments*, the analogy is very loose indeed." *Id.*
(emphasis added).

debarment of Kaspersky Lab is of a very different character in that, in addition to its permanency (not to mention its obvious nonconsensual nature), it applies equally to any "successor entity" going even beyond the "legislative decree of perpetual exclusion from a chosen vocation" of the sort found to be punitive in *Lovett,* 328 U.S. at 316.  It is, therefore, anything but a benign "line of business" restriction.

### 2.   The 'Past v. Future Conduct' Distinction has No Application Here.

The government also argues that "[t]he Supreme Court has recognized a 'decisive distinction' between statutes that impermissibly punish past action and those that permissibly regulate future conduct," Br. 13-14, *quoting Am. Communications Assn, C.I.O. v. Douds*, 339 U.S. 382, 413–14 (1950)—and that while "the employment bars struck down by the Supreme Court" all relate to past conduct, the NDAA focuses exclusively on prospective risk.  Br. 13. This is simply incorrect.

*Douds* upheld a so-called "non-Communist affidavit provision" of the National Labor Relations Act, which barred any union's access to the National Labor Relations Board unless an affidavit was on file by the union officers renouncing allegiance to the Communist Party. 339 U.S. at 385-86.  As the government highlights in its brief, *see* Br. at 13, the Court stated, "[T]here is a decisive distinction: in the previous decisions [*Lovett, Garland, and Cummings*] the individuals involved were in fact being punished for *past* actions; whereas in this case they are subject to possible loss of position only because there is substantial ground for the congressional judgment that their beliefs and loyalties will be transformed into *future* conduct." *Id*. at 413 (emphasis in original).   But the government omits that this distinction turned on law's escapability:

> [Communist Party members] are free to serve as union officers if at any time they
> renounce the allegiances which constituted a bar to signing the affidavit in the

> past. Past conduct…is *not* a bar to resumption of the position. [By contrast,] [i]n [*Lovett, Garland, and Cummings*]…the basis of disqualification was past action or loyalty, nothing that those persons proscribed by its terms could ever do would change the result. Here the intention is to forestall future dangerous acts; *there is no one who may not, by a voluntary alteration of the loyalties which impel him to action, become eligible to sign the affidavit.* We cannot conclude that this section is a bill of attainder.

*Id.* at 414 (emphasis added). In contrast, the NDAA is absolutely inescapable for Kaspersky Lab.

Fifteen years later, in *Brown*, the Supreme Court expressly distinguished and limited *Douds*[11] by invalidating a successor statute criminalizing Communists Party members from serving as labor union officers. *Brown*, 381 U.S. at 457-58, 438-39, 460-62. In *Brown*, the government made nearly the same argument as it now makes here—the "aim is not to punish [the targets] for what they have done in the past, but rather to keep them from positions where they will in the future be able to bring about undesirable events." *Id.* at 456-57. The Court flatly rejected this, along with the "distinction" between wrongful past conduct and prevention of future harms, and invalidated the statute as a bill of attainder:

> This case is not necessarily controlled by *Douds*…It would be archaic to limit the definition of "punishment" to "retribution." Punishment serves several purposes: retributive, rehabilitative, deterrent—and preventive. One of the reasons society imprisons those convicted of crimes *is to keep them from inflicting future harm*, but that does not make imprisonment any the less punishment.
>
> * * * *
>
> We think that the Court in *Douds* misread *United States v. Lovett* when it suggested that that case could be distinguished on the ground that the sanction there imposed was levied for purely retributive reasons…[As in *Lovett*], the purpose of the statute before us is to purge the governing boards of labor unions of those whom Congress regards as guilty of subversive acts and associations and therefore unfit to fill positions which might affect interstate commerce.

---

[11] "Whatever may be said technically about any remaining vitality of the *Douds* case, it obviously belongs to a discredited regime, though, like *Plessy v. Ferguson*, it has never been officially overruled." *Bryson v. United States*, 396 U.S. 64, 76 (1969)(J. Douglas, dissenting). Only six members of the Court participated in *Douds*, and only one half of those participated in the section of the Court's decision deciding the bill of attainder clause challenge. *See Id.*

*Id*. at 457-58, 460 (emphasis added).  In other words, "legislation which inflicts a deprivation on named or described persons or groups constitutes a bill of attainder *whether its aim is retributive, punishing past acts, or preventive, as in this case, discouraging future conduct*."  *Crain v. City of Mountain Home*, 611 F. 2d 726, 729 (8th Cir. 1979), *citing Id*. at 458 (emphasis added).  Thus, as Professor Tribe's constitutional law treatise puts it, "[M]easures enacted not in order to punish but in order to prevent future harm have been condemned as forbidden bills of attainder when such measures have been thought to rest on a legislative determination that particular persons have shown themselves to be blameworthy or at least culpably unreliable." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW, § 10-5, 655 (2d ed. 1988)(*citing Brown*)(treatise quoted in *BellSouth I*, 144 F.3d at 65, and *BellSouth II*, 162 F.3d at 684, 686)(attached as Ex. A).

### 3. There is No "Proceed with Dispatch" Exception to the Historical Test.

Next, the government suggests that *Nixon* creates a broad exception to the historical punishment cases, where Congress must "proceed with dispatch" or where an issue "demand[s] [Congress's] immediate attention." *See* Br. at 14, *quoting Nixon,* 433 U.S. at 472.  This expansive reading understates the facts in *Nixon*.  As Professor Tribe also explains:

> There can be little doubt…that a law depriving Richard Nixon *by name* of access to future *government employment* would have been struck down as a forbidden bill of attainder despite…the odd notion that Mr. Nixon is 'a legitimate class of one.'  How, then, is one to account for the Supreme Court's holding in that case that Congress acted constitutionally when, in the Presidential Recordings and Materials Preservation Act, it provided for governmental custody of his presidential papers and his alone?
>
> * * * *
>
> [T]he very specificity of the [Act's] disability—its singling out of Mr. Nixon by name—heightened the sting, and the stigma, of what had been done in the statute.  But stigma alone may not suffice to make an attainder where the deprivation is

19

*limited in duration, and as circumscribed by provisions for compensation* should private property be taken, as was the case in *Nixon.*

TRIBE, *supra*, § 10-5, at 651-52 (emphasis added)(attached as Ex. A).  The NDAA, by contrast, imposes a permanent deprivation, with no compensation whatsoever, and contains no safeguards or limitations.[12]  Professor Tribe states that "[t]he identification of an individual by name should raise an *almost conclusive presumption of constitutionally suspect specification*…." *Id*. at § 10-4, 646 n.25 (emphasis added).  "Hopefully," Professor Tribe writes, "Chief Justice Burger is correct in his suggestion that the Court's holding [in *Nixon*] might itself eventually constitute a 'class of one.'" *Id*. (*quoting Nixon*, 433 U.S. at 545 (dissenting opinion).[13]

### 4.   The Historic Test Does Not Require Congress's Explicit Determination of Guilt.

Finally, the government argues that the invalidation of a statute on bill of attainder grounds requires Congress to make an explicit legislative determination of guilt. Br. at 11.  The Supreme Court has long rejected this argument.  "[A] formal legislative announcement of moral blame worthiness or punishment is not a necessary aspect of an unlawful bill of attainder." *Nixon*, 433 U.S. at 480, *citing Lovett,* 328 U.S at 316.  *See also*, *Cummings,* 71 U.S. at 327.  For this very reason, in *Florida Youth Conservation Corps,.* the court found that "although the

---

[12] *See Id.* at § 10-5, at 652 n.10, observing, for example, the Act's "failure to bar Mr. Nixon from any specified employment or vocation," and other distinguishing features and safeguards present, on which basis the Act survived bill of attainder scrutiny.  None of these are present in the NDAA.

[13] Defendant's citation to *Seariver Maritime Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662 (9th Cir. 2002)(cited at Br. at 15) does not support its argument.  In that case, the Ninth Circuit upheld the challenged statute in part because it created an "open-ended" class: it excluded from Prince William Sound any vessel that spills more than one million gallons of oil (anywhere).  The class included not only the Exxon Valdez (which spilled 11 million gallons), but also numerous other vessels. *See Id.* at 667, 670.  By contrast, the NDAA imposes the debarment on a "closed-class" of one:  Kaspersky Lab.

legislative enactment does not explicitly announce a finding of guilt on any specified charge, that is its obvious import." 2006 U.S. Dist. LEXIS 44732, at *5 ("[P]laintiff has in effect been found guilty of an unspecified charge and, as its sentence, has been barred from state contracting of the type at issue.").  The same is true here.

## II.     The NDAA Ban Imposes "Punishment" Under the Functional Test.

To determine if the burden imposed functions punitively, the D.C. Circuit (1) considers whether the statute "serve[s] purposes that are not only nonpunitive, but also rational and fair;" (2) requires "a nexus between the legislative means and legitimate nonpunitive ends," and (3) mandates that the "court must weigh the purported nonpunitive purpose of a statute against the magnitude of the burden it inflicts." *Foretich*, 351 F.3d at 1222; *see* Br. at 15.  In addition, "[o]ther aspects of a challenged statute also bear on the bill of attainder analysis" including: (1) whether there are any "protective measures designed to safeguard the rights of the burdened individual;" (2) the "selectivity or scope of a statute;" and (3) "the availability of less burdensome alternatives." *Foretich*, 351 F.3d at 1222.  The government fails to acknowledge these "other aspects." *See Id.*; Br. at 15.  Nor does the government acknowledge that to uphold the NDAA under this functional test, "the nonpunitive aims *must be sufficiently clear and convincing." Foretich*, 351 F.3d at 1222 (internal quotation omitted, emphasis added).  Taking these into account, there can be no reasonable dispute that the NDAA's burden—the permanent, unconditional, inescapable debarment of Kaspersky Lab from all federal government contracting—functions punitively.

### A.  The NDAA is Functionally a Punishment, Notwithstanding the National Security Context.

The government's reliance on a purported national security purpose does not redeem the NDAA.  To the contrary, the purported purpose actually strengthens Plaintiffs' case: "The

21

temptation to utilize bills of attainder is especially strong when national security is thought to be threatened." *Linnas v. INS*, 790 F. 2d 1024, 1028 (2d Cir. 1986), *citing Lovett,* 328 U.S. 303 (1946)(finding unconstitutional attainder of government employees thought "subversive" during wartime).

"'Even measures historically associated with punishment—such as permanent exclusion from an occupation—have been otherwise regarded when the nonpunitive aims of an apparently prophylactic measure have seemed sufficiently clear and convincing.'" *BellSouth I,* 144 F.3d at 65, *quoting* TRIBE, *supra*, § 10-5, at 655 (*citing Hawker v. New York*, 170 U.S. 189 (1898) and *DeVau v. Braisted*, 368 U.S. 144 (1960))(quoted at Br. at 15). "And, conversely, measures enacted not in order to punish but in order to prevent future harm have been condemned as forbidden bills of attainder when such measures have been thought to rest on a legislative determination that particular persons have shown themselves to be blameworthy or at least culpably unreliable." TRIBE, *supra*, § 10-5, at 655 (*citing Brown*, 381 U.S. 437)(attached at Exhibit A).

Specifically, in both *Brown,* and *Lovett*, the Court held that Congress could enact legislation purging a "threat to the national security"—but could do so only through "rules of general applicability." *Brown*, 381 U.S. at 453, 461. In *Brown*, the government claimed that the intent of the challenged statute "[wa]s to purge the governing boards of labor unions of those whom Congress regard[ed] as guilty of subversive acts and associations," thereby "protect[ing] the national economy by minimizing the danger of political strikes." *Id*. at 460, 439. The NDAA's purpose and effect are the same: to "purge" Kaspersky Lab from information systems, based on unproven and unfounded allegations that the Company poses a threat to the security of those systems. This burden functions punitively. As the Court has made clear, Congress can

"weed dangerous persons," but "must accomplish such results by rules of general applicability"—and "cannot specify the people upon whom the sanction it prescribes is to be levied." *Id*. at 461.

### B. Congress Failed to Tailor the Nexus Between Means of the NDAA and its End.

Nor is the nexus sufficiently tailored to meet the ends of the NDAA.  The NDAA reflects the same "pil[ing] on [of] a burden"—with no "tailor[ing]" whatsoever, as the bill of attainder in *Consolidated Edison*. *See* 292 F.3d at 354.  There, the Second Circuit invalidated a state law prohibiting a utility from increasing its rates to pay for replacement electricity and other costs associated with an outage following a nuclear power plant accident, due to failure to timely replace known faulty generators. *Id*. at 343-45.  The challenged statute functioned punitively because it reflected the "legislature pil[ing] on a burden," requiring the utility to internalize costs that it would have incurred regardless of the accident. *Id*. at 352-54.  "The legislature easily could have tailored [the statute] to exclude from the pass-through prohibition those substantial costs that would have been incurred absent misconduct on [the utility's] part." *Id*. at 354.[14]

Here, Senator Shaheen, in her media statements, initially spoke only of the supposed "threat…posed by [Kaspersky Lab's] antivirus and security *software* products."  *See* Compl., Ex. C (emphasis added).  Not only does the debarment of Kaspersky Lab software function punitively—but Congress 'piled on' the same prohibition for hardware, and then, critically expanded the ban to "any…services." NDAA § 1634(a).  As explained above, the ban on "any…services" has extraordinary reach.  It would prohibit, for example, the government from

---

[14] Defendant's citation to *Dehainaut v. Pena,* 32 F.3d 1066 (7th Cir. 1994)(cited at Br. 20) is unavailing.  In that case, which did not involve legislative action but rather "an executive agency's interpretation of a presidential directive", the issue was the imposition of a job qualification on "a fixed identifiable group…the fired [air traffic] controllers"—not the singling out of an individual by name, as here.  *Id*. at 1070, 1071.

hiring Kaspersky Lab to give a paid lecture or for a consulting services arrangement for Kaspersky Lab employees simply to *inform* government IT personnel about new cyber threats, for example, those originating in Russia.[15]

### C. Congress has Imposed a Burden Clearly Disproportionate to the Purported Nonpunitive Purpose.

The NDAA also functions punitively because the magnitude of its burden is in "grave imbalance" with the purported nonpunitive purpose. *See Foretich*, 351 F.3d at 1222. To determine punitiveness, the court does not look just at the "severity of a statutory burden in absolute terms." *Id*. Rather, the court must consider "the magnitude of the burden *relative* to the purported nonpunitive purposes of the statute." *Id*. (emphasis added). "A grave imbalance or disproportion between the burden and the purported nonpunitive purpose suggests punitiveness, *even where the statute bears some minimal relation to nonpunitive ends*." *Id*. (emphasis added). Further, the government cannot "defend the constitutionality of the statute simply by positing any nonpunitive purpose" or "purposes that superficially appear to be nonpunitive." *Id*. at 1223. Rather, the court must consider the plausibility of the government's purported nonpunitive justification, rather than accept it at face value. *Id*.

The magnitude of the NDAA's burden on Kaspersky Lab is clearly severe. *See* Compl., ¶ 45. The NDAA permanently "memorializes a judgment by the United States Congress" that Kaspersky Lab deserves complete, unconditional, and permanent debarment even though

---

[15] In addition, the ban on "any…services" prevents federal agencies from accessing Kaspersky Lab's Threat Intelligence Services in various formats, including its wholly-passive threat data and Advanced Persistent Threat (APT) feeds. Considering that Kaspersky Lab is one of the world's leading authorities on Russian cyber threat actors, and was the first cyber security company to publicly report on the existence, penetration techniques, and targets of "CozyDuke", a Russian-speaking APT involved in infiltrating the networks of the Democratic National Committee prior to the 2016 presidential election, this language reflects an absence of tailoring and casts doubt on Congress's purported "rational, nonpunitive purpose of protecting the U.S. government's information systems from the threat of Russian cyber intrusion." Br. at 16.

executive branch officials have admitted that there is no conclusive evidence that Kaspersky Lab has caused any breach at all. *See Id.*; *Foretich*, 351 F.3d at 1223. This injury results from "the particular means Congress adopted in the [NDAA]"—the naming and singling out Kaspersky Lab in the statute. *See Id.* at 1223; Compl., ¶ 45. In addition, beyond the reputational harm, the NDAA permanently deprives Kaspersky Lab of any potential government business. *Id.* at ¶ 49.

Contrary to the government's arguments, *see* Br. at 20, the "narrow application of a statute to a specific person or class of persons raises suspicion, because the Bill of Attainder Clause is principally concerned with the *singling out* of an individual for legislatively prescribed punishment." *Foretich*, 351 F.3d at 1224 (internal quotation omitted, emphasis in original, alternation omitted). "Therefore, the functional test necessarily takes account of the scope or selectivity of a statute in assessing the plausibility of alleged nonpunitive purposes." *Id.* The NDAA must therefore be viewed with suspicion because Congress could have instead enacted a law of general applicability that would have achieved the same nonpunitive purposes. *See* Compl., ¶ 40.

Instead, by design, the NDAA "implies" that the federal government "needs special protections" from Kaspersky Lab "alone." *Foretich*, 351 F.3d at 1224. In so doing, the NDAA "officially associates" Kaspersky Lab with a purported threat to national security. *Id.* As a result, the NDAA "creates a vilified class of one." *Id.* This appears to have been the desired effect—to cause reputational damage that extends well beyond the federal government. In fact, in her September 4, 2017, New York Times Opinion, Senator Shaheen wrote: "Why then are federal agencies, *local and state governments, and millions of Americans* unwittingly inviting this threat [Kaspersky Lab] into their cyber networks and secure spaces?" *See* Compl., Ex. C at 1 (emphasis added).

As in *Foretich*, "it is the [statute's] specificity that renders the asserted nonpunitive purposes suspect. And, it is the [statute's] specificity that creates the injury to [Kaspersky Lab's] reputation." *Id*. at 1224. Therefore, "there exists a significant imbalance between the magnitude of the burden imposed and [the] purported nonpunitive purpose, [so] the statute cannot reasonably be said to further nonpunitive purposes." *Id.* at 1221-22, *citing Consol. Edison*, 292 F.3d at 354. *See, also Id.* at 1224 ("[T]he fact that Dr. Foretich was *singled out* for this severe burden belies the claim that Congress's purposes were nonpunitive….It is the relative imbalance between the burden in this case and the implausible nonpunitive purposes that compels us toward a finding of punitiveness.").

The government hardly counters this. *See* Br. at 21-22. It ignores the reputational damage altogether, and diminishes the burden as merely the loss of "one of [Plaintiffs'] many sources of revenue." Br. at 22. Defendant's citation to *ACORN v. United States*, 618 F.3d 125 (2d Cir. 2010)(Br. 22) does not change the result. In *ACORN*, the Second Circuit held that "Congress must have the authority to [temporarily] suspend [discretionary] federal funds to an organization that *has admitted to significant mismanagement*." *Id*. at 137 (emphasis added). Here, Kaspersky Lab has not admitted to any wrongdoing whatsoever, and, indeed, there has been no such finding. Moreover, while the challenged appropriation in *ACORN* had "an expiration date," the NDAA has no sunset provision or expiration date, and the debarment is permanent. *See Id*. at 136-37

### D.  Congress Failed to Provide Any Protective Measures for Kaspersky Lab.

"The inclusion of protective measures designed to safeguard the rights of the burdened individual or class weighs against a finding that a statute is a bill of attainder." *Foretich*, 351 F.3d at 1222, *citing Nixon* at 433 U.S. at 477. For example, in *Nixon*, Congress provided

safeguards for former President Nixon, and the Court accordingly found that the burden did not function punitively. *See* 433 U.S. at 482 ("Congress…ordered the General Services Administration to establish regulations that recognize 'the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to' the articulated objectives of the Act.'").

Not only does the legal effect of the NDAA never lapse or expire, but the government already has a well-established mechanism in the FAR to debar contractors.  However, Congress deliberately stepped in to free the government from the safeguards that would have accompanied debarment under the FAR. *See, e.g., Consol. Edison,* 292 F.3d at 349 ("the decision to bypass the PSC reinforces our conclusion that the legislature's decision was to find guilt and order punishment directly").  Allowing the NDAA to stand would encourage Congress to debar others similarly situated to Kaspersky Lab without the attendant due process protections that would be required if the debarment was effectuated through a constitutionally sound administrative process.

Not only is the NDAA devoid of safeguards for the Company, it also fails to provide any objective standard for Kaspersky Lab to meet in order to extricate itself from the ban.  "[A] statute unlawfully specifies under the Bill of Attainder prohibition when it defines a closed class, a class with a membership that is permanently fixed when the class is defined, from which members can never exit and into which nonmembers can never enter, as a matter of law.  Courts have found the hallmarks of Bill of Attainder specificity to be irreversibility and retrospectivity...." *Elgin v. United States*, 697 F. Supp. 2d 187, 198 (D. Mass. 2010)(internal quotation omitted), *vacated on jurisdictional grounds*, 641 F.3d 6 (1st Cir. 2011), *aff'd* 567 U.S. 1 (2012).

### E. The Selectivity and Scope of the Statute is Indicative of a Punitive Purpose.

The court in *Foretich* also held that "the selectivity or scope of a statute may indicate punitiveness where the differential treatment of the affected party or parties cannot be explained without resort to inferences of punitive purpose." 351 F.3d at 1222 (internal quotations omitted). It is difficult to ascertain what justification (other than punishment) Congress may have had for singling out Kaspersky Lab by name.

As the Second Circuit put it, "What, then, we must ask, other than punishment can justify [the legislature's chosen means]?" *Consol. Edison*, 292 F.3d at 354. The NDAA's disproportionate result is unsurprising given the threadbare legislative history underlying it. *See supra*, Compl., ¶¶ 25-37.   As in *Consolidated Edison*, "the legislature in this case made no attempt whatsoever to ensure that the costs imposed on [the statute's target] were proportional to the problems that the legislature could legitimately seek to ameliorate." 292 F.3d at 354.  Here, there were no legislative findings or analysis relevant to the scope of the NDAA, but simply a Congressional mandate to impose the broadest possible ban across the entire federal government. *See* Compl.,  ¶¶ 26-37.  The NDAA operates as a complete ban on the Kaspersky Lab brand without focus, selection or specificity. *See generally, Caudell v. City of Toccoa,* 153 F. Supp. 2d 1371, 1379 (N.D. Ga. 2001)(striking down statute as bill of attainder, explaining that the statute "cannot be regarded as a carefully considered decision to further nonpunitive legislative purposes; the legislation was simply rubber-stamped into law by the Georgia General Assembly and [the] Governor.")

### F. Less Burdensome Alternatives also Demonstrate the NDAA's Punitive Function.

Finally, "the availability of less burdensome alternatives can also cast doubt on purported nonpunitive purposes." *Foretich*, 351 F.3d at 1222, *citing inter alia, Consol. Edison*, 292 F.3d at 354. The FAR is the established procedure the federal government uses to debar contractors and Congress could have referred the matter to the executive branch to consider such a proceeding. Alternatively, as explained above, Congress could have made an effort to tailor the ban to the perceived threat, much as it might have enacted a law of general applicability. It did neither.

It is telling that Defendant never addresses these "[o]ther aspects" which "bear on the bill of attainder analysis." *See Foretich*, 351 F.3d at 1222; Br. 15-22. In fact, rather than addressing the "availability of *less* burdensome alternatives," Defendant conceives of *more* burdensome methods which, according to Defendant, Congress hypothetically could have imposed. *See Foretich*, 351 F.3d at 1222 (emphasis added); Br. at 17.

In sum, the NDAA's nonpunitive aims are not "sufficiently clear and convincing." *Foretich*, 351 F.3d at 1221. "No *wholly* non-punitive purpose [can] justify the" NDAA's permanent, unconditional, and broad ban against all Kaspersky Lab hardware, software, and services. *See Consol. Edison*, 292 F.3d at 351 (emphasis added).

### III. The Absence of a Legislative Record Further Indicates a Congressional Intent to Punish.

The final test for punishment is "strictly a motivational one: inquiring whether the legislative record evidences a congressional intent to punish." *Foretich*, 351 F.3d at 1225, quotation omitted. "Under this prong, a court must inspect legislation for a congressional purpose to encroach on the judicial function of punishing an individual for blameworthy offenses." *Id.* (internal quotation and alteration omitted).

Defendant emphasizes that "this prong *by itself* is not determinative in the absence of unmistakable evidence of punitive intent….and cannot render a statute a bill of attainder *without any other indicia of punishment*." *Id.* at 1225 (internal quotation omitted, emphasis added); *see also* Br. at 22.   However, Plaintiffs are not challenging the constitutionality of the NDAA on "this prong by itself"— Plaintiffs have already demonstrated "other indicia of punishment." *See Id.*   The D.C. Circuit has explained that under this prong, "[e]vidence in the legislative history can *bolster* [the] conclusion…where other factors suggest punitiveness." *Id.* at 1225 (emphasis added). *See also, e.g., Consol. Edison*, 292 F.3d at 354-55 ("Although the evidence of punitive intent in the legislative record in this case is insufficient *on its own* to justify a conclusion that Chapter 190 is punitive…[The] legislative history *bolsters our prior conclusion* that a significant portion of Chapter 190's cost-pass-through prohibition is plainly punitive.")(emphasis added).

Specifically, under this prong, "a formal legislative announcement of moral blameworthiness or punishment is not necessary to an unlawful bill of attainder." *Foretich*, 351 F.3d at 1225 (internal quotation omitted).   Rather, "[a]ll that is necessary is that the legislative process and the law it produces indicate a congressional purpose to behave like a court and to censure or condemn." *Id.*, *citing Brown*, 381 U.S. at 453-54.   "Courts conduct this inquiry by reference to the legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation." *Id.* at 1225.

Senator Shaheen made clear in her media statement that Kaspersky Lab was a "case" for Congress and "the case…is overwhelming." *See* Compl., Ex. E.   But it is not Congress's function to adjudicate the individual "case against Kaspersky Lab"—that is the Court's role—and the bill of attainder clause was designed to prevent Congress from doing so. *See Brown*, 381 U.S. 445-46.

The clarity of Senator Shaheen's statements in the media are extraordinary when compared to the lack of any evident deliberation of the ban as enacted within the halls of Congress.   As set out in great detail above, the plain language of the NDAA is equally extraordinary.   As if it were a checklist, the statute contains every hallmark of an unconstitutional bill of attainder: (1) permanence (there is no expiration date or sunset provision); (2) inescapability (no matter change Kaspersky Lab makes, it remains debarred); (3) lack of procedural safeguards (the statute contains no provisions attempting to safeguard the Company's rights); (4) and overbreadth (applies to all products and "any…services" without limitation and passes on to any "successor entity").   Accordingly, when read with Senator Shaheen's extra-legislative statements, the plain language of the statute, and the lack of any legislative history underlying the NDAA ban as enacted is highly indicative and telling of the NDAA's punitive intent.[16]

## CONCLUSION

The government concedes that the NDAA applies with specificity.  The NDAA imposes legislative punishment under each of the historical, functional, and motivational tests.  Plaintiffs submit that under the historic test, the permanent debarment is *per se* punitive, and conclusively establishes the ban's unconstitutionality—and at a minimum, weighs the factor heavily on the side of punishment.  The provisions also fail the functional and motivational tests.  Therefore, the NDAA violates the bill of attainder clause.

For all of the aforementioned reasons, the Court should therefore deny the Defendant's Motion to Dismiss.

---

[16] Relatedly, Section 1634(c) of the NDAA, introduced at the end of the legislative process in the November 9, 2017, Conference Report, appears as a late attempt to correct the impermissibility of Sections 1634 (a) and (b) as a bill of attainder. *See* Compl. ¶ 37.

Dated:  April 9, 2018

Respectfully submitted,

*/s/ Ryan P. Fayhee*
Ryan P. Fayhee (Bar No. 1033852)
*/s/ Steven Chasin*
Steven Chasin (Bar No. 495853)
**Baker & McKenzie LLP**
815 Connecticut Avenue NW
Washington D.C. 20006
Tel: (202) 452 7024
Fax: (202) 416 7024
Ryan.Fayhee@bakermckenzie.com
Steven.Chasin@bakermckenzie.com

*Attorneys for Kaspersky Lab, Inc. and Kaspersky Labs Limited*