**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| KASPERSKY LAB, INC.; and | ) | |
| KASPERSKY LABS LIMITED, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| *v.* | ) | Civ. No. 18-325 (CKK) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

   I.   Section 1634 Does Not Fit within the Historical Meaning of Legislative Punishment. ...... 3

   II.  Section 1634 Furthers the Non-Punitive Purpose of Protecting Federal Information
        Systems. ...................................................................................................................... 9

   III.  The Legislative Record Contains No Evidence That Congress Intended
         Section 1634 as "Punishment." ............................................................................. 17

CONCLUSION..................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ACORN v. United States*,
  618 F.3d 125 (2d Cir. 2010) ................................................................................................ 7

*BellSouth Corp. v. FCC*,
  144 F.3d 58 (D.C. Cir. 1998) ................................................................................... 5, 8, 16

*BellSouth Corp. v. FCC*,
  162 F.3d 678 (D.C. Cir. 1998) .................................................................................. passim

*Consol. Edison Co. of N.Y., Inc. v. Pataki*,
  292 F.3d 338 (2d Cir. 2002) ..................................................................................... passim

*Cummings v. Missouri*,
  71 U.S. (4 Wall.) 277 (1866) ............................................................................................ 4, 8

*De Veau v. Braisted*,
  363 U.S. 144 (1960) ........................................................................................................ 10

*Fla. Youth Conservation Corps., Inc. v. Stutler*,
  No. 4:06CV275-RH/WCS, 2006 WL 1835967 (N.D. Fla. June 30, 2006) ................................ 6

*Flemming v. Nestor*,
  363 U.S. 603 (1960) ............................................................................................. 9, 17, 19

*Foretich v. United States*,
  351 F.3d 1196 (D.C. Cir. 2003) ............................................................................ 4, 16, 17

*Ex Parte Garland*,
  71 U.S. (4 Wall.) 333 (1866) ......................................................................................... 4, 8

*Mendelsohn v. Meese*,
  695 F. Supp. 1474 (S.D.N.Y. 1988) ................................................................................. 7

*Navegar v. United States*,
  192 F.3d 1050 (D.C. Cir. 1999) ................................................................................ passim

*Nixon v. Administrator of Gen. Servs.*,
  433 U.S. 425 (1977) ................................................................................................ passim

*Pierce v. Carskadon*,
  83 U.S. (16 Wall.) 234 (1872) .......................................................................................... 4

*Planned Parenthood of Cent. N. Carolina v. Cansler*,
   877 F. Supp. 2d 310 (M.D.N.C. 2012) ................................................................. 6, 7

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*,
   309 F.3d 662 (9th Cir. 2002) ............................................................................. 12, 15

*Selective Serv. Syst. v. Minn. Public Interest Research Grp.*,
   468 U.S. 841 (1984) .......................................................................................... passim

*Siegal v. Lyng*,
   851 F.2d 412 (D.C. Cir. 1988) ........................................................................ 5, 6, 10

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ................................................................................................. 4

*United States v. Brown*,
   381 U.S. 437 (1965) .............................................................................................. 4, 8

*United States v. Lovett*,
   328 U.S. 303 (1946) ................................................................................... 4, 7, 8, 20

*Williamson v. Lee Optical*,
   348 U.S. 483 (1955) ................................................................................................ 15

**Statutes**

Pub. L. No. 115-91, 131 Stat. 1283 (2017) ................................................................. 17

**Regulations**

48 C.F.R. § 9.405 ........................................................................................................ 16

**Legislative Materials**

147 Cong. Rec. E517-04 2001 WL 321768 (2001) ...................................................... 23

148 Cong. Rec. E992-02, 2002 WL 1267907 (2002) .................................................... 23

**Other Authorities**

Check Point Software Technologies LTD., *How to Disable and Remove Kaspersky Lab
Components from Check Point Security Gateway*,
   https://supportcenter.checkpoint.com/supportcenter/portal?eventSubmit_doGoviewsolutionde
   tails=&solutionid=sk118539 ................................................................................. 14

Kaspersky Lab, *Technology Partnerships*,
   https://usa.kaspersky.com/partners/technology ...................................................... 14

Kaspersky Lab, *Technology Partnerships*,
   https://web.archive.org/web/20170824055221/https://usa.kaspersky.com/
   partners/technology.............................................................................................................14

NDAA FY 2018, U.S. Senate Armed Services Committee,
   https://www.armed-
   services.senate.gov/imo/media/doc/FY18%20NDAA%20Summary6.pdf...........................18

## **INTRODUCTION**

For this Court to find merit in Kaspersky's bill of attainder claim, it would have to conclude that Congress could not act to prevent a specific threat posed by software on U.S. government systems, *even if that threat were fully acknowledged* by the vendor. As Kaspersky sees it, Congress would be powerless to act even if Kaspersky publicly acknowledged that it was engaging in espionage on behalf of a foreign adversary. That is a remarkable conception of the Bill of Attainder Clause which, unsurprisingly, finds no basis in law or reason.

First, Section 1634 does not fit within the historical meaning of legislative punishment. The Bill of Attainder Clause exists to protect persecuted and vulnerable individuals and private groups from invidiously motivated legislative punishment. It has no application to a restriction that inhibits a corporation from obtaining discretionary government contracts, and Kaspersky cannot plausibly analogize the prohibition in Section 1634 to the types of employment bars imposed against individuals that have been struck down as punitive.

Second, Section 1634 furthers the legitimate, non-punitive purpose of addressing a risk to U.S. information systems. Kaspersky does not dispute that Congress has a legitimate interest in safeguarding U.S. networks from the threat of Russian cyber intrusion, but argues instead that the provision is necessarily punitive because it specifies Kaspersky by name, imposes undue burdens on its operations, and brands the company as a security risk.

But the notion that the bill of attainder inquiry begins and ends at specificity has already been foreclosed by the Supreme Court.  In *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 469-70 (1977), the Court rejected the suggestion that a constitutional violation exists whenever a law imposes undesired consequences on an individual or on a class that is not defined in general terms. Here, it was perfectly reasonable for Congress to conclude that "software, hardware and services, developed or provided by" Kaspersky, a Moscow-based cybsersecurity firm with unusually close

ties to the Russian intelligence services, pose a greater risk to federal information systems than products and services developed by other vendors. Nothing about the specificity of the statute or the form of the prohibition suggests punitive intent.

Finally, there is no "unmistakable evidence" of congressional intent to punish Kaspersky. In fact, there is no evidence of congressional intent to punish at all. Although Kaspersky is quick to accuse Congress of caving to "political pressure and expediency," the company cannot point to a single statement, amongst hundreds of pages of legislative materials, to suggest that Congress was drawn to this issue by public clamor, that the legislative response was an effort "to be seen as reacting" to Russian hostility, or that there was anything remotely punitive in the design of Section 1634.

Congress's powers are not so constrained that it must depend on Executive action in order to protect federal systems against intrusion by a foreign power, particularly when the threat is known and poses an ongoing risk. The non-punitive purpose of the NDAA is clear and uncontested, and this action should therefore be dismissed.

## ARGUMENT

Whether a statute inflicts "punishment" for the purposes of the Bill of Attainder Clause requires analysis of three questions: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of the burdens imposed, reasonably can be said to further non-punitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Serv. Syst. v. Minnesota Public Interest Research Group*, 468 U.S. 841, 852 (1984). These three factors are considered as a whole, and "only the clearest proof could suffice to establish the unconstitutionality of a statute" based on impermissible legislative motive. *Flemming v. Nestor*, 363 U.S. 603, 617 (1960). Here, the three factors all lead to the same conclusion: Section

1634 is not a "punitive" action against Kaspersky. It is instead a law that was enacted to advance the wholly proper legislative purpose of safeguarding federal information systems from intrusion by a foreign power.

## I.   Section 1634 Does Not Fit within the Historical Meaning of Legislative Punishment.

The Supreme Court has recognized that certain types of punishment are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription of the [Bill of Attainder Clause]." *Nixon*, 433 U.S. at 471. "The classic example is death, but others include imprisonment, banishment, the punitive confiscation of property, and prohibition of designated individuals or groups from participation in specified employments or vocations." *Consol. Edison Co. of N.Y., Inc. v. Pataki,* 292 F.3d 338, 351 (2d Cir. 2002) (citations omitted). Kaspersky's bill of attainder claim hinges on a meritless analogy between legislation prohibiting government agencies from using a particular company's products and legislation prohibiting disfavored individuals or groups from pursuing their livelihoods.

Section 1634 is not a legislative bar to participation in a specified employment or profession. The statute has nothing to do with employment, and to the extent it can be said to "bar" Kaspersky from doing anything, it does so indirectly, by effectively foreclosing the company from seeking discretionary contracts from the U.S. government, one of its many sources of revenue.[1]  As such, it is categorically different from prior cases in which the government has prohibited an individual

---

[1] As the company has acknowledged, sales to the federal government make up "a tiny fraction" of the company's sales in the United States, with "[a]ctive licenses held by federal agencies totaling $54,000, or "0.03% of Plaintiff Kaspersky Lab, Inc.'s annual U.S. sales." *Kaspersky Lab v. DHS*, 17-cv-2697, Dkt 10-1 (Jan. 17, 2018). Under Section 1634, Kaspersky loses that "tiny fraction" of sales, but it retains the right to operate in the United States, including the right to develop, market, and sell its products and services to individuals, private companies, and other customers not covered by Section 1634's prohibition.

from seeking a type or category of employment.[2] It is instead a decision by Congress not to allow government use of products from a company that poses a significant security concern.

Kaspersky's analogy to historic employment bars is therefore untenable. Prohibiting use of a company's hardware, software and services on federal networks, with the effect of restricting its ability to seek discretionary contracts from the government, is nothing like barring unpopular individuals or groups from participating in a chosen profession.

*First*, Section 1634 bears no resemblance to traditional employment bars because it does not single out individuals or private groups based on unpopular conduct and correspondingly threaten the exercise of personal rights. *Cf. United States v. Lovett*, 328 U.S. 303 (1946) (three federal employees who had been targets of an investigation into "subversive activities" conducted by the House Committee on Un-American Activities); *United States v. Brown*, 381 U.S. 437 (1965) (members of the Communist Party); *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1866) (members of the Confederacy); *Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866) (same); *Pierce v. Carskadon*, 83 U.S. (16 Wall.) 234 (1872) (same). As the Supreme Court has stressed, "courts have consistently regarded the Bill of Attainder Clause of Article I and the principle of separation of powers only as protections for *individual persons and private groups*, those who are peculiarly vulnerable to non-judicial determinations of guilt." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (emphasis added).

---

[2] While recognizing that Section 1634 does not "fit precisely within the historic category," Pls Opp 8, Kaspersky insists the statute bears "congruity to historic punishments," which (the company says) "still carries weight in the analysis," *id*. Just how much weight this Court should afford to a statutory analog that is "not entirely incongruous" with historic punishment is not clear, but if the *Foretich* decision is any indication, the answer does not support the extraordinary relief that Kaspersky seeks. *See* 351 F.3d at 1218-20.

The D.C. Circuit has refused to stray from the Supreme Court's narrow conception of unconstitutional bars to employment. *See BellSouth Corp. v. FCC,* 162 F.3d 678, 684 (D.C. Cir. 1998) (*BellSouth II*) (observing that statutes constitute historical employment bars only where there are concerns that a restriction infringes on fundamental religious or political freedoms); *Navegar v. United States*, 192 F.3d 1050, 1066 (D.C. Cir. 1999) (rejecting suggestion that a statute banning specific brands of assault weapons was comparable to traditional employment bars targeting disfavored groups); *BellSouth Corp. v. FCC*, 144 F.3d 58 (D.C. Cir. 1998) (*BellSouth I*) (refusing to equate restrictions "on corporations seeking to engage in specific types of commercial activity" with "traditional employment debarments"); *see also Siegal v. Lyng*, 851 F.2d 412 (D.C. Cir. 1988) (finding no historical punishment where the statute barred agricultural licensees from employing, within one year of revocation, any individual deemed "responsibly connected" with a person who had been found to have committed a flagrant or repeated violation of the statute); *cf. Selective Serv.*, 468 U.S. at 852-53 (a statute denying funds to which individuals had no entitlement "impose[d] none of the burdens historically associated with punishment").

Seeking to distinguish the two *BellSouth* decisions, Kaspersky maintains that the employment bar analogy failed to gain traction in those cases because the challenged provisions were "innocuous" line-of-business restrictions, comparable to ordinary business regulation. Pls Opp 15. This reads the *BellSouth* cases too narrowly. In dismissing comparisons to legislative bars to employment, the *BellSouth* courts focused not on the "run-of-the-mill" nature of the challenged statutes but rather the exceedingly narrow class of employment bars found to be severe and invidious enough to fit the historic definition of punishment. *See* 162 F.3d at 686; 144 F.3d at 65. Nothing about the reasoning in these decisions suggests their outcomes hinged on the type of economic restriction at issue, and the D.C. Circuit's subsequent decision in *Navegar* makes any

argument to that effect untenable. 192 F.3d 1050, 1066 (upholding a statute barring specific brands of assault weapons against a bill of attainder challenge, and specifically rejecting the employment-bar analogy). Indeed, even when it was faced with an *actual restriction on employment*, the D.C. Circuit still showed no willingness to drift from the historical conception of punishment. *Siegel*, 851 F.2d at 416.

Kaspersky attempts to counter this long line of circuit precedent with two out-of-circuit district court bill of attainder decisions involving legislative debarments. *See* Pls Opp 10-12 (citing *Planned Parenthood of Cent. N. Carolina v. Cansler*, 877 F. Supp. 2d 310, 323 (M.D.N.C. 2012); *Fla. Youth Conservation Corps., Inc. v. Stutler*, No. 4:06CV275-RH/WCS, 2006 WL 1835967, at *1 (N.D. Fla. June 30, 2006)). Even if the Court were to disregard controlling circuit precedent and consider these decisions at face value, neither would carry the day for Kaspersky.

The first case is an unpublished order issued at the preliminary injunction stage. *Fla. Youth Conservation Corps.*, 2006 WL 1835967, at *1. The bill of attainder analysis consists of three sentences, and the court's rationale is based exclusively on its finding that the "obvious import" of the statute was to "announce a finding of guilt." *Id*. The court does not *acknowledge*, let alone apply, the Supreme Court's three-part punishment test, yet Kaspersky treats the court's ultimate conclusion—that the statute was "very much akin to the enactments that prompted the framers" to prohibit bills of attainder—as a full-throated endorsement of the analogy between contractor debarment and the historic employment bars. *See* Pls Opp 10.

In the second case, the district court overturned a statute barring the state's health agency from providing money to Planned Parenthood. *Planned Parenthood*, 877 F. Supp. 2d at 323. The funding prohibition excluded Planned Parenthood from funding relating to both abortion and non-abortion related services, and the court's analysis focused on the absence of a non-punitive

6

justification for extending the ban beyond the organization's abortion-related activities. And while the court found the exclusion analogous to the historic employment bars, it did so without explanation, citing only to the *Florida Youth* decision (discussed above). *Id*.[3]

Neither of these decisions gives any serious consideration to the Supreme Court's bill of attainder jurisprudence. And Kaspersky makes no effort to reconcile them with the D.C. Circuit's refusal to draw comparisons to the historical employment bars outside of cases where there are concerns that a restriction infringes on fundamental religious or political freedoms *See, e.g.*, *BellSouth II,* 162 F.3d at 684; *Navegar*, 192 F.3d at 1066. But even if there were reason to look outside the D.C. Circuit, the comparison between legislative debarment and historic employment bars was recently rejected by the Second Circuit, which concluded that withholding federal funds from a named entity is not comparable to the "cutoff of pay to specified government employees held to constitute punishment . . . [in *Lovett*, 328 U.S. at 317]." *ACORN v. United States*, 618 F.3d 125, 136 (2d Cir. 2010). Further, the Supreme Court has emphasized that a statute denying funds to which individuals had no entitlement "impose[d] none of the burdens historically associated with punishment." *Selective Serv.*, 468 U.S. at 852-53.

*Second*, and relatedly, this Court must account for the distinction inherent in the application of the Bill of Attainder Clause to a corporation rather than an individual. Neither the Supreme Court nor the D.C. Circuit has held that the Clause applies to corporations, and the D.C. Circuit has observed "obvious" differences between individuals and corporations that "must necessarily [be]

---

[3] By contrast, in *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1476 (S.D.N.Y. 1988), the court explained that the statute "inflicted punishment on those few individuals in this country officially affiliated with the PLO." *Id*. at 1489. It was the statute's effect on those *individuals* (not the PLO) that the court compared to the historic employment bars. That comparison is of no help to Kaspersky; if anything, it underscores the weakness of its legal theory.

take[n] into account" for the purposes of a bill of attainder analysis. *BellSouth II*, 162 F.3d at 683-84. The court went even further in *BellSouth II*, suggesting that the Clause's application to corporations may depend on whether the company is "closely held," such that "an attainder would fall on a narrowly circumscribed, easily identified group of flesh-and-blood people." 144 F.3d at 63. Even then, the court continued, the Clause would be less likely to apply if the penalty were a line-of-business restriction (as opposed to a fine), because the inquiry would depend on the ability of the officers and shareholders "to carry on their pursuits outside the named corporation." 144 F.3d at 63 n.5.

Kaspersky has yet to seriously grapple with this distinction. Instead, it presupposes at every turn that the two corporate plaintiffs in this case stand on the same footing as the "the flesh-and-blood" plaintiffs in *Lovett*, who were legislatively barred from federal employment following an investigation into "subversive activities," 328 U.S. at 308-13; or those in *Brown*, who were criminally barred from serving as officers or employees in labor unions based on their membership in an unpopular political group, 381 U.S. at 437; or those in *Cummings* and *Ex Parte Garland*, who were required, on pain of banishment from their professions, to swear loyalty oaths to the United States, 71 U.S. at 317; 71 U.S. at 376. Kaspersky cannot seriously contend that the effects of Section 1634 are akin to having to lie under oath or renounce one's political belief and wait five years to in order to engage in a profession, rather than akin to the numerous legislative restrictions imposed on corporations that have been upheld by the D.C. Circuit. As the D.C. Circuit has recognized, *Garland* and *Brown* are "a far cry" from cases where, as here, the statutory requirements imposed on the plaintiffs are comparable to "numerous regulatory measures aimed at particular industries." *BellSouth II*, 162 F.3d at 685; *cf. SeaRiver Maritime Fin. Holdings, Inc.*

*v. Mineta*, 309 F.3d 662, 675 (9th Cir. 2002) ("The Clause is concerned with the punishment of individuals, not objects").

*Third*, unlike the employment bars invalidated by the Supreme Court, the challenged restriction in Section 1634 comes about not as punishment for past activity, but rather "as a relevant incident to a regulation of a present situation." *Flemming*, 363 U.S. at 614. Congress did not appropriate to itself the judiciary's task of assigning guilt, and Section 1634 does not identify any of Kaspersky's prior acts as wrongdoing. Instead, the statute imposes a purely prospective restriction on the U.S. government's use of Kaspersky products and services.

Kaspersky insists the "past v. future conduct distinction" does not apply here, reasoning that legislation that inflicts a deprivation on a named individual "constitutes a bill of attainder whether its aim is retributive . . . or preventive." Pls Opp 19. Even if that were true, it hardly follows that the distinction between retrospective and prospective legislation is immaterial. The Supreme Court has stressed that the Bill of Attainder Clause is violated only if Congress "legislatively determines guilt and inflicts punishment . . . without provision of the protections of a judicial trial." *Nixon*, 433 U.S. at 468. And according to one of Kaspersky's lead authorities, an "indispensable element of a bill of attainder is its retrospective focus: it defines past conduct as wrongdoing." *Consolidated Edison*, 292 F.3d at 349. Section 1634 is not concerned with actions Kaspersky has already taken; its focus, rather, is preventing future compromises of federal information and information systems that harm national security. It is difficult to imagine how such a prospective focus on national security could be analogized to a historical form of legislative punishment.

## II.    Section 1634 Furthers the Non-Punitive Purpose of Protecting Federal Information Systems.

"[L]egislation will survive Bill of Attainder attack if the statute furthers non-punitive legislative purposes." *Siegel*, 851 F.2d at 418. The determinative issue is "whether the legislative

aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation." *De Veau v. Braisted*, 363 U.S. 144, 160 (1960). If so, the legislation should be upheld without more.

Section 1634's prohibition is neither a determination of guilt nor a condemnation of Kaspersky's past conduct as meriting punishment. It reflects, instead, an entirely proper government concern about the security of federal information systems. The provision is a protective measure aimed at safeguarding U.S. networks from the threat of Russian cyber intrusion, and Congress's focus on addressing risk (rather than inflicting punishment) is apparent from the face of the statute, the direct legislative history, and an extensive body of legislative materials generated in the months leading up to Section 1634's enactment.

Kaspersky does not suggest that it was unreasonable for Congress to be concerned by the prospect of a foreign adversary exploiting vulnerabilities in the government's supply chain to gain access to its networks. And it would be difficult to quarrel with the rationality of Congress's premise that a Moscow-based firm, subject to Russian law, with ties to the Russian intelligence services, poses a greater risk to U.S. government information systems than other antivirus vendors. Indeed, it makes no difference from Kaspersky's standpoint whether Congress's action is supported by overwhelming — or, indeed, conclusive — evidence of a threat. In Kaspersky's view, "the purported national security purpose *actually strengthens* Plaintiffs' case." Pls Opp 21 (emphasis added).

This logic is hopelessly circular. On the one hand, Kaspersky accuses Congress of acting out of political expediency and dismisses its security concerns as "vague and inflammatory." Compl. ¶ 3; Pls Opp 1. On the other, it laments the government's "temptation to utilize bills of attainder" when "national security is thought to be threatened," and condemns Congress for "villif[ying]" it

by "officially associat[ing]" it with "a purported national security threat." Pls Opp 22. In other words, at least where national security risk is concerned, the more evidence the government marshals in support of its decision to legislate with specificity, the more likely the challenged statute is to fail the "non-punitive purpose" test. If that were the law, Congress would be powerless to directly address national security threats whenever the person or entity posing that threat is specifically identifiable. The Bill of Attainder Clause has never been understood to impose such an arbitrary constraint on Congress's ability to legislate in defense of the nation's security.

Further, Kaspersky's argument betrays a fundamental misunderstanding of the restrictions that the Bill of Attainder Clause places on Congress. In Kaspersky's view, the Clause precludes Congress from singling out any entity when Congress legislates in the area of national security. *See* Pls Opp 22. Because Congress could have enacted a general rule, Kaspersky reasons, its decision to legislate with specificity was necessarily punitive. *Id*. This reasoning extends the Bill of Attainder Clause far beyond the limits recognized by the Supreme Court, and Kaspersky's reliance on *Brown* and *Lovett* only underscore the errors of its analysis. In *Lovett* and *Brown*, it was critical to the Supreme Court's invalidation of the legislative employment bars that those bars rested on the constitutionally repugnant premise that political affiliation could predict an individual's propensity to engage in future misconduct. Neither *Lovett* nor *Brown* suggest that Congress is prohibited from legislating with specificity, and the Court's subsequent decision in *Nixon* forecloses any such reading. *See* 433 U.S. at 471 (explaining that the Bill of Attainder Clause "was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress . . . that legislatively burdens some persons or groups but not all other plausible individuals").

While specificity is an element of a bill of attainder, singling out a person does not automatically offend the Bill of Attainder Clause. *Nixon*, 433 U.S. at 471. The Supreme Court has recognized that specific designations may be perfectly rational, such as where an appropriate class of one exists. *Id*. This case illustrates that principle. Kaspersky is the only significant U.S. government antivirus vendor with headquarters in Moscow and well-documented connections to the Kremlin. It was perfectly rational for Congress to conclude that a Russia-based cybersecurity firm with close ties to the Russian intelligence services — the same Russian intelligence services that have conducted sophisticated cyber operations against the United States and its allies — presented a comparatively high risk to federal information systems. Kaspersky, in other words, was the only contractor whose products "demanded immediate attention" – a "legitimate class of one." *Id*. at 472; *see Navegar*, 192 F.3d at 1066 (statute barring specific brands of assault weapons permissibly "singled out certain weapons as dangerous and disproportionately linked to crime"); *SeaRiver Maritime Fin. Holdings*, 309 F.3d at 675 (Congress's concern that the Exxon Valdez posed a greater risk of spillage than other oil tankers was sufficient to justify statute excluding the vessel from Prince William Sound). Having identified an urgent and entirely singular threat to federal information systems, Congress had every right to "proceed with dispatch" and enact legislation barring the use of Kaspersky products and services, rather than enacting a general set of security requirements and counting on more than one hundred individual agencies to independently arrive at the same national security judgment it had already made.[4]

---

[4] Of course, by the time Section 1634 was signed into law, the Department of Homeland Security had already issued Binding Operational Directive (BOD) 17-01. But Section 1634 goes further than the BOD in two key respects. First, unlike the BOD, Section 1634's prohibition applies to national security systems or other systems used by the Department of Defense and the Intelligence Community. Second, while the BOD exempts two specific Kaspersky-branded services and does not apply to Kaspersky code embedded in the products of other companies, the NDAA ban covers all agency use of Kaspersky hardware, software, and services, whether of branded Kaspersky

In truth, Kaspersky does not seriously contend, because it cannot, that Congress lacked a non-punitive objective in enacting Section 1634 to protect federal information systems. Instead, it suggests that the non-punitive motivations cannot save the law because Congress could have used narrower or less burdensome means to achieve its legislative end. According to Kaspersky, Section 1634 "pile[s] on" needless, overly broad restrictions; imposes unnecessary and disproportionate burdens on the company; and fails to provide "protective measures." Pls Opp 23-29. As an initial matter, while the Supreme Court has recognized that such an inquiry "is often useful" in answering the question "whether a legislature sought to inflict punishment on an individual," *Nixon*, 433 U.S. at 482, it has never suggested that legislation is subject to a least-restrictive-means test merely because the regulated party finds it burdensome. Kaspersky may have different views about how Congress could have responded to the clear, non-punitive motivation supporting Section 1634, but the fact that it would have legislated differently had it been entrusted with representative powers fails to establish that Section 1634 is an unconstitutional bill of attainder.

Kaspersky contends that Congress, by extending Section 1634's prohibition to include (in addition to "software") "hardware" and "services," failed to "tailor the nexus between [the] means of the NDAA and its end." Pls Opp 23 (citing *Consolidated Edison*, 292 F.3d 338). According to Kaspersky, despite the fact that Senator Shaheen "initially spoke only of the supposed threat posed by Kaspersky software products," Congress later "punitively 'piled on'" prohibitions for "hardware" and "services." *Id*.

The alleged over-inclusiveness of the statute casts no doubt on its non-punitive purpose. Congress has wide latitude in selecting the means of pursuing its goals without raising attainder

products or Kaspersky code embedded in software or hardware products sold by third-party vendors.

concerns, *see BellSouth II*, 162 F. 3d at 689, and the government need show only that the ends and means "overlap in large part." *Selective Serv.*, 468 U.S. at 854. That showing is easily met here, where the ends (foreclosing a pathway for Russian cyber intrusion to federal agencies) and the means (prohibiting agencies from using software, hardware, and services that could be used to facilitate such an intrusion) are a tight match. *See, e.g., Williamson v. Lee Optical,* 348 U.S. 483, 487-88 (1955) ("The law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction and that it might be thought that the particular measure was a rational way to correct it.").

In any event, it was entirely reasonable for Congress to apply Section 1634 to a broad range of Kaspersky software and services in light of the perceived concerns about the vulnerabilities created by Kaspersky software and the security threats posed by Kaspersky and its connections to the Russian government. *See* MTD 3-9 (describing legislative record). Congress also had good reason to ensure that the prohibition applied to Kaspersky-developed software that is integrated into the hardware and software products of third-party vendors.[5] By the same token, it was hardly arbitrary

---

[5] Section 1634(a) applies to "any hardware . . . developed or provided, *in whole or in part*," (emphasis added) by Kaspersky. Kaspersky has publicly promoted its partnerships with, and its incorporation of Kaspersky software into the products of, various hardware (and software) manufacturers.            *See, e.g.*,     Kaspersky   Lab,    *Technology    Partnerships*, https://web.archive.org/web/20170824055221/https://usa.kaspersky.com/partners/technology (cached webpage provided because Kaspersky appears to have taken down this webpage); Check Point Software Technologies LTD., *How to Disable and Remove Kaspersky Lab Components from Check            Point            Security            Gateway*, https://supportcenter.checkpoint.com/supportcenter/portal?eventSubmit_doGoviewsolutiondetail s=&solutionid=sk118539 (instructions for removal of Kaspersky software components from Check Point Security Gateway products).  Kaspersky currently states: "Kaspersky Lab Technology solutions are available for integration into any network node: servers, hardware and software firewalls, Internet gateways, [Unified Threat Management] hardware, mobile and service provider networks, as well as all kinds of data security software."  Kaspersky Lab, *Technology Partnerships*,    https://usa.kaspersky.com/partners/technology.   When Kaspersky software is integrated into partner hardware products, this hardware qualifies as hardware developed or provided "in part" by Kaspersky.  And there is no reason to believe that congressional concerns

to extend the prohibition to services, which would include, for example, threat hunting, incident response, and security assessments, and which can provide Kaspersky with access to government networks, whether to install software to perform the service or to otherwise influence security practices on the network.

Indeed, the narrow tailoring of Section 1634 stands in stark contrast to the statute invalidated in *Consolidated Edison*, 292 F.3d at 354. There, while acknowledging that a legislature may legitimately decide that a negligent power company "should bear the costs attributable to its negligence," the court concluded that the challenged statute was a bill of attainder because the costs allocated to the negligent company were excessive and could not be squared with the non-punitive purpose of prevention. *Id*. Here, by contrast, the costs incurred by Kaspersky (*i.e.*, the loss of future government business) bear a clear relation to the non-punitive purpose of the law. *See SeaRiver*, 309 F.3d at 675 n.7 ("Congress has allocated not the past cost of the oil spill, as in *Consol. Edison*, but the risk of a future oil spill."). The analogy to *Consolidated Edison*, and the broader argument of punitive intent, would be more plausible if Congress had sought to require Kaspersky to bear the costs of removing and discontinuing use of its products, or if, instead of prohibiting the "use" of Kaspersky products and services, and thereby requiring federal agencies to undergo a costly and burdensome implementation process, Congress had simply prohibited agencies from purchasing Kaspersky products and services in the future. But Congress instead placed those costs on federal agencies, rather than Kaspersky, revealing that the focus was on information security, not punishing Kaspersky for past intrusions.

---

with Kaspersky software apply any less when this software is incorporated into the products of other companies.

Further, the burden imposed on Kaspersky — the effective loss of the ability to seek discretionary contracts from the U.S. Government — is not in "grave imbalance" with the non-punitive purpose of the regulation. The court found such an imbalance in *Foretich* because the statute permanently identified the plaintiff as guilty of the "horrific crime[]" of sexually abusing his daughter, despite repeated acquittals by courts. 351 F.3d 1196, 1222 (2003). Here, Kaspersky is subject to a legislative restriction, the effects of which federal contractors have abided for years under standard debarment procedures. Such debarments are, by design, vendor-wide; they debar the vendor from transacting *any* business with the government, regardless of how innocuous the product is or whether it has any connection to the grounds for debarment. *See* 48 C.F.R. § 9.405; *see also BellSouth I*, 144 F.3d at 65 (finding no attainder where the regulatory burden is standard and used elsewhere). Such long-endured restrictions are poles apart from the crippling disabilities that have been found to satisfy the functional test of punishment. *See BellSouth II*, 162 F.3d at 686-88 (collecting cases showing that "burdensome regulation" is not equivalent to punishment).

Kaspersky's remaining contentions about the "protective measures" Congress might have used are meritless. Kaspersky accuses Congress of using Section 1634 to circumvent the safeguards the company would have received had it been subject to debarment. Pls Opp 27. The suggestion that Congress was motivated by a desire to strip Kaspersky of procedural protections is based on nothing more than the company's say-so. It also is discredited by the more plausible explanation for taking legislative action, which is that even if Congress were inclined to wait for an agency to initiate debarment proceedings, debarment would only have prohibited *future* transactions; it would not have provided a means to require agencies to stop using Kaspersky products already on

their networks.[6] Along these lines, Kaspersky's insistence that Congress should have provided "an objective standard for Kaspersky Lab to meet in order to extricate itself from the ban" (Pls Opp 27) further highlights the error in its argument. Congress need not carve out exceptions or create safe harbors in order to show that its motivations are non-punitive. *See SeaRiver Maritime*, 309 F.3d at 671-72 (statute was non-punitive even though it imposed burdens based on "irreversible conduct"). Rather, Congress can serve non-punitive ends and be thorough at the same time. Absent a plausible basis for concluding otherwise, a statute does not lose its non-punitive character simply because Congress did not see fit to qualify it. *Cf. Williamson*, 348 U.S. at 487-88.

## III.   The Legislative Record Contains No Evidence That Congress Intended Section 1634 as "Punishment."

The legislative record cannot support an inference that a law is motivated by a desire to "punish" someone unless it presents "unmistakable evidence of punitive intent." *Selective Serv. Sys.*, 468 U.S. at 855 n.15 (citation omitted). And "it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers." *Flemming*, 363 U.S. at 617.

It would be the unique case where a law would be constitutionally suspect as a bill of attainder yet there exists no evidence in the legislative record that Congress intended the law to have a punitive purpose. *See, e.g.*, *Consolidated Edison*, 292 F.3d at 355 (legislation's sponsor openly

---

[6] Kaspersky asserts, in conclusory fashion, that Section 1634's "successor entity" language constitutes "punitive confiscation" by "causing the debarment to stick" to Kaspersky's successors, thereby "diminish[ing] the value of the corporation." Pls Opp 11 n.6. For one thing, Kaspersky has no property interest in discretionary contracts it may or may not have been awarded in the future, *see Selective Serv.*, 468 U.S. at 852-53, and it cannot manufacture such an interest by vaguely alluding to the possibility of the company's sale in the future. But even assuming this provision were confiscatory, Kaspersky still would have to make a plausible showing that Congress was trying to punish Kaspersky, rather than seeking to ensure that the statute's prohibition could not be circumvented by the simple expedient of a name change or corporate transfer.

expressed his intent to punish a particular corporation); *Foretich*, 351 F.3d at 1225-26 (members spoke of the need to correct the errors of a particular judge and bring justice to a particular family). Yet, that is precisely how Kaspersky sees this case, as it devotes little attention to this factor in the constitutional test other than trying to minimize its importance. That is because there is nothing in the legislative record to support the notion that Section 1634 was intended as a punishment, rather than an attempt at protecting the security of federal information systems.

At the outset, Section 1634 itself does not express any intention to punish Kaspersky. *See* Pub. L. No. 115-91, 131 Stat. 1283 (2017) (expressing the purpose of prohibiting use of Kaspersky software, hardware, and services and requesting executive branch reporting on procedures for removing suspect products from federal networks). And the direct legislative history speaks only in terms of prospective risk, describing the precursor of Section 1634 as a response to "reports that the Moscow-based company might be vulnerable to Russian government influence."[7] That same concern appears throughout the legislative record, which documents months of investigation and study leading up to Section 1634's enactment, with various congressional committees holding hearings and seeking details about Kaspersky and the incumbent information security risks arising from its products from witnesses, experts, and government officials. *See* MTD 3-9.

But notwithstanding the extensive body of material to draw from, Kaspersky cannot point to a *single* piece of evidence in the legislative record — not a hearing transcript, not a committee report, not a record statement — that suggests Congress was motivated by a desire to punish the company. Instead, the company banks its entire punitive-intent analysis on Senator Shaheen's statement that "the case against Kaspersky Lab is overwhelming." Pls Opp 30-31. In Kaspersky's eyes, Senator

---

[7] NDAA FY 2018, U.S. Senate Armed Services Committee at 10, https://www.armedservices. senate.gov/imo/media/doc/FY18%20NDAA%20Summary6.pdf

Shaheen's use of the phrase "case against Kaspersky" is indicative of a broader effort by Congress to usurp the judicial function and conduct the kind of "trial by legislature" the Bill of Attainder Clause was designed to prevent. Pls Opp 30-31.

But it is hardly surprising that Senator Shaheen would suggest that the case for legislating was overwhelming, in light of the extensive information that supported congressional action. Read in context, Senator Shaheen's full statement explained that the presence of Kaspersky software on federal networks creates a "vulnerability to our national security," because of the "alarming and well-documented" ties between Kaspersky and the Kremlin. *See* Compl., Ex. E. In other words, she was repeating the same security concerns that lawmakers and intelligence officials had been considering for months. Her use of the word "case" — a term that members of Congress often use to explain the need for legislation[8] — was idiomatic and certainly not proof of punitive intent. Kaspersky's focus on this remark, and its wildly inflated claims about what it symbolizes, bear out the Supreme Court's admonition that "inquiries into Congressional motives are at best a hazardous matter," particularly "when the inquiry seeks to go beyond objective manifestations." *Flemming*, 363 U.S. at 617.

Kaspersky asserts, without explanation, that the "clarity of Senator Shaheen's statements in the media are extraordinary when compared to the lack of any evident deliberation of the ban as enacted within the halls of Congress." Pls Opp 31. But it is unclear how Kaspersky could make such a statement when it had concededly been the subject of intense congressional scrutiny months

---

[8] *See, e.g.,* 147 Cong. Rec. E517-04, E518, 2001 WL 321768 (2001) ("However, the case for legislation merging the BIF and SAIF is clear and should not get bogged down in the more general debate on deposit insurance reform."); 148 Cong. Rec. E992-02, 2002 WL 1267907 (2002) ("The International Longshore and Warehouse Union testified before the Transportation and Infrastructure Committee and made a compelling case for legislation to mandate security checks of containers.").

before Senator Shaheen proposed legislation, with no fewer than five separate committees having heard testimony on the Kaspersky issue, and with the Senate Armed Services Committee having already published a document describing the proposed legislation as a response to reports that Kaspersky "might be vulnerable to Russian government influence." *See, supra*; *Foretich*, 351 at 1225 (bill of attainder analysis requires "reference to the legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation").

Kaspersky has pointed to *no* evidence in the legislative record of Congress's punitive intent, much less the "unmistakable evidence" required to state a claim. *See Navegar, Inc.,* 192 F.3d at 1067 (concluding that although appellants "are repeatedly named in the floor debates . . . [t]hese allegations fall well short of the type of evidence required to show a legislative intent to punish"); *cf. Lovett*, 328 U.S. at 309 (describing comments from congressmen as "legislative lynching, smacking of the procedure in the French Chamber of Deputies, during the Reign of Terror") (citations omitted).

## CONCLUSION

Kaspersky has not stated a plausible claim that Section 1634 offends the Bill of Attainder Clause. The legislative record reveals no evidence to suggest that Congress enacted Section 1634 as punishment; Congress has advanced a legitimate, non-punitive reason for acting; and the statute's prohibition does not fit within the historic meaning of punishment. The challenged provision is entirely lawful. The complaint should therefore be dismissed.

Dated:  April 16, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ERIC R. WOMACK

DIANE KELLEHER
Assistant Branch Directors
Civil Division

*/s/ Samuel M. Singer*
SAMUEL M SINGER (D.C. Bar 1014022)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, D.C.  20530
Telephone:  (202) 616-8014